**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**APR 28 2005**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**
**TENTH CIRCUIT**

A. JANE PLOTKE, Ph.D.,

        Plaintiff-Appellant,

v.

THOMAS E. WHITE, Secretary of the
Army,

        Defendant-Appellee.

No. 02-3289

**Appeal from the United States District Court**
**for the District of Kansas**
**(D.C. No. 00-CV-2453-CM)**

Jeffrey W. Bruce, The Bruce Law Firm, Belton, Missouri, for Plaintiff-Appellant.

Nancy Landis Caplinger, Assistant United States Attorney, Topeka, Kansas (Eric
F. Melgren, United States Attorney, and Melanie D. Caro, Assistant United States
Attorney, Kansas City, Kansas, on the brief), for the Defendant-Appellee.

Before **SEYMOUR**, **McKAY** and **TYMKOVICH**, Circuit Judges.

**SEYMOUR**, Circuit Judge.

Dr. A. Jane Plotke filed suit against the Secretary of the Army under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-16, alleging the Army had unlawfully terminated her from her employment as an historian due to her gender. The district court granted summary judgment to the Army. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we reverse.

## I.

Whether the Army was entitled to summary judgment is a question of law we review *de novo*. *Croy v. Cobe Labs., Inc.*, 345 F.3d 1199, 1201 (10th Cir. 2003). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). In applying this standard, "[a]ll inferences arising from the record before us must be drawn and indulged in favor of the [nonmovant]." *Stinnett v. Safeway, Inc.*, 337 F.3d 1213, 1216 (10th Cir. 2003) (internal quotations omitted). "Credibility determinations [and] the weighing of the evidence . . . are jury functions, not those of a judge . . . ." *Id.* (internal quotations omitted). Read in this light, the record reflects the following facts.

Dr. Plotke was hired by Dr. Rodler Morris and Dr. Scott Lackey on July 10,

1994, as a GS-12 historian at the U.S. Army Combined Arms Center (CAC), Army Knowledge Network-Combat Training Center-Warrior Information Network (CTC-WIN) located at Fort Leavenworth, Kansas. Dr. Plotke's employment was subject to successful completion of a one-year probationary period pursuant to 5 C.F.R. § 315.801 *et seq.*, after which she would be considered a permanent career-conditional federal civilian employee. Dr. Plotke was the first and only female to be hired as an historian at Fort Leavenworth.

Dr. Plotke testified that, on her first day of work, Dr. Lackey told her he had been under pressure from the Civilian Personnel Office (CPO) to hire a female historian; Dr. Plotke was the only female historian who had applied for the position; and, rather than risk losing the position and funding, Dr. Morris and Dr. Lackey had decided to hire Dr. Plotke. According to Dr. J. Patrick Hughes, the CAC Assistant Command Historian, Dr. Lackey remarked that the EEO office "would get off their back" and stop pressuring them to hire a female historian because Dr. Plotke had received the position.[1] Aplt. App. at 522. Dr. Lew Bernstein, a male, was hired as a CAC GS-12 historian at the same time as Dr. Plotke, but was assigned to a different unit.

---

[1] The Army argues that Dr. Hughes' statements are inadmissible hearsay. Aple. Br. at 52 n.23. We disagree. These statements come into evidence as admissions of a party-opponent under Federal Rules of Evidence 801(d)(2)(A), (C), and (D).

Immediately upon arriving at Fort Leavenworth, Dr. Plotke was informed of a history office "staff ride" to the General Custer Battlefield at Little Big Horn, South Dakota. Fellow historian George Mordica, who was a temporary and later a term employee, was planning the event. Mr. Mordica was a retired Army Major and had not obtained a Ph.D. When Mr. Mordica told Dr. Plotke about the staff ride, he painted a picture of inhospitable living conditions and downplayed the significance of the event. Mr. Mordica described the staff ride as involving "very rough" camping conditions in a bunkhouse with a "dormitory arrangement" lacking separate sleeping facilities for a female. *Id.* at 394, 673. Dr. Plotke declined the "invitation" after determining that her participation was obviously being discouraged. Mr. Mordica stated to others that having a female in attendance on the trip would prevent the all-male group from "sitting around drinking beer, smoking cigars, and farting." *Id.* at 521, 1028. Contrary to the negative representations he made to Dr. Plotke regarding the trip, Mr. Mordica stated in a deposition that the staff ride was a very professionally rewarding activity and experience.

Dr. Plotke was initially advised by Dr. Morris that a significant portion of her job duties would include historical research, analysis and writing. But her assignment from July until October 1994 was instead to "support" Dr. Lackey in the drafting of a computer services contract, a task which was largely

-4-

administrative and clerical in nature and fell outside of Dr. Plotke's position description. From October until December 1994, she was assigned to various administrative and computer projects. By contrast, Dr. Bernstein, who had been hired at the same time as Dr. Plotke, was assigned to historical research and writing projects supervised by Dr. Richard Gorell. Dr. Plotke was not provided any written performance appraisal by Dr. Morris or Dr. Lackey during the first half of her probationary year, although her performance was highly praised verbally. *See id*. at 365, 827 (Dr. Plotke's job performance was described as "fantastic" and "excellent" by Dr. Lackey and Dr. Morris).

Dr. Plotke complained to Dr. Lackey and the CPO about her initial job assignments. In response, Dr. Lackey told Dr. Plotke that she could not perform historical research and analysis until her security clearance arrived. In December 1994, Dr. Plotke discovered that her security clearance, along with Dr. Bernstein's, had arrived at the Fort Leavenworth CTC-WIN facility in late August or early September 1994. Dr. Bernstein was given his clearance shortly after its arrival but Dr. Plotke's clearance was not delivered to her until mid-December 1994.

After she hunted down her own security clearance, Dr. Plotke was temporarily assigned on detail to the "Haiti project" under the supervision of Dr. Gorell. This assignment involved some historical research and analysis as well as

administrative computer tasks similar to those Dr. Plotke had previously been assigned. Dr. Gorell affirmed that Dr. Plotke's performance on the Haiti project was "excellent." *Id*. at 550. He also testified that she was the only person available with the technical expertise to do the job. Dr. Plotke's work on the Haiti project was highly and publicly praised by Lt. Col. Steve Dietrich of the Army's Center on Military History in Washington, D.C. It was also known by her colleagues that she was very happy working on the Haiti project.

Despite Dr. Plotke's success and personal satisfaction on the Haiti detail, Dr. Morris abruptly removed her from the project in mid-May 1995, and reassigned her to an administrative computer project supporting Dr. Lackey in CTC-WIN. Dr. Morris claimed there was an urgent need to transfer Dr. Plotke back to CTC-WIN, although Dr. Plotke's work on the Haiti project was not yet complete and there was no deadline to complete the CTC-WIN project. Dr. Morris later admitted that subsequent to Dr. Plotke's termination, the CTC-WIN project was never completed. He also conceded that he transferred Dr. Plotke after being informed by the CPO that her one-year probationary period was nearing its completion. At the end of successful completion of her probationary year, Dr. Plotke's appointment could have been extended. Dr. Morris also testified that he believed Dr. Gorell would have recommended Dr. Plotke's employment be extended beyond her one-year probationary period at the time of

the transfer.

Dr. Plotke began working again under the full supervision of Dr. Lackey for the CTC-WIN project on June 5, 1995. On June 8, Dr. Plotke submitted a memo requesting permission to attend four seminars at a conference for historians in Canada scheduled over two weeks in August. "[I]t was the office policy that historians could (and were actually encouraged to) attend an all expenses paid professional conference of their own choosing each year, even on topics for which there was only a personal interest and not necessarily a business-related purpose." *Id*. at 522. Prior to June 1995, Dr. Plotke had not exercised her conference choice for the fiscal year. Dr. Lackey and Dr. Morris agreed to send Dr. Plotke to only two of the four seminar sessions.[2] Dr. Morris left it to Dr. Lackey to "make recommendations" to Dr. Plotke regarding which two seminars she should attend. *Id*. at 621, 660-61. In an e-mail memo dated June 16, Dr. Lackey advised Dr. Plotke that she was limited to attending two seminars and suggested she attend one concerning peacekeeping operations and another on computers and history. Dr. Lackey did not indicate that Dr. Plotke was required to select the two

_____

[2]According to Dr. Lackey, the reasons for limiting Dr. Plotke's participation to two conferences were year-end financial considerations and a desire to send another historian (Dr. Bernstein) to the other conferences. However, neither Dr. Bernstein nor any other historian was sent to the Canada conferences. Dr. Gorell, Dr. Bernstein's supervisor, testified he was never informed that Dr. Morris or Dr. Lackey wished to send a second historian from his office to the Canada conferences.

seminars he recommended, nor that her selections had to be scheduled in the same week. In fact, Dr. Morris admitted that Dr. Lackey's memo was not clear in conveying its alleged intent that Dr. Plotke was to choose two sessions within the same week.

Dr. Lackey requested that Dr. Plotke provide him with cost figures regarding the seminars. Dr. Lackey's secretary, Linda Darnell, contacted Dr. Plotke to obtain those figures and Dr. Plotke faxed her the necessary information. Ms. Darnell did not specifically advise Dr. Plotke that she was using the cost information to prepare a DD Form 1610, "Request and Authorization for TDY Travel of DOD Personnel." The two seminars Dr. Plotke ultimately selected to attend were scheduled in different weeks. Dr. Plotke also indicated to Ms. Darnell that she intended to take two weeks of annual leave at the conclusion of the conferences. Dr. Lackey anticipated that Dr. Plotke would take annual leave in connection with her professional travel, as was common practice by the male historians while on temporary duty, and he so stated in a memo to Dr. Morris.[3] Dr. Lackey admitted that he had never rejected an employee's request for annual leave, he "[m]ost likely" would have approved Dr. Plotke's leave, and he had no

_____

[3]Dr. Lackey forwarded to Dr. Morris a copy of the June 16 e-mail he sent to Dr. Plotke, after adding the following comment: "The next twist, of course, will be that she will apply for annual leave and stay up there for the other two conferences anyway, but at least we won't be on the hook for the per diem." Aplt. App. at 588.

-8-

reason to believe that Dr. Morris would have decided otherwise. *Id*. at 715.

From the information Dr. Plotke provided, Ms. Darnell prepared a budget travel worksheet and a DD Form 1610. She then submitted the DD Form 1610 to Dr. Gorell for his signature, mistakenly believing that he was Dr. Plotke's immediate supervisor at that time.[4] Dr. Plotke did not review the documents because they were not submitted to her prior to being processed. Dr. Gorell signed the form as the "requesting official," and Ms. Darnell then forwarded the form to Dr. Morris. Dr. Morris became upset because Dr. Gorell, rather than Dr. Lackey, had signed the form and because Dr. Plotke had requested approval for conferences that were scheduled in different weeks. Dr. Morris was also agitated because Dr. Plotke had not obtained advance approval from Dr. Lackey to take annual leave following the Canada conferences. *Id*. at 767.[5]

On Dr. Morris' command, Dr. Lackey conducted a fact-finding or "junior counseling session" on June 21 with Dr. Plotke regarding the travel matter, which became known as the TDY incident. Dr. Morris then held a "senior counseling

_____

[4]Ms. Darnell explained that Dr. Gorell had been Dr. Plotke's supervisor the last time Dr. Plotke was issued a DD Form 1610, and Dr. Plotke's prior form was saved in the computer. When Ms. Darnell pulled up Dr. Plotke's form, Dr. Gorell was still listed as her supervisor. Unaware that Dr. Lackey, rather than Dr. Gorell, was actually Dr. Plotke's supervisor at the time, Ms. Darnell did not alter the supervisor's name on the form.

[5]As referenced *supra*, note 3, Dr. Plotke provided evidence to the contrary indicating that Dr. Lackey told Dr. Morris he fully expected Dr. Plotke to apply for annual leave so that she could attend additional conferences.

session" with Dr. Plotke on June 26. *Id*. at 906. The Army admits that Dr. Morris decided to terminate Dr. Plotke on June 26 after concluding the senior counseling session. Dr. Morris prepared a memo on June 27 for Dr. Plotke advising her she was being terminated due to her unsatisfactory conduct. "This conduct involved: failure to follow guidance issued by superiors; failure to follow established chains-of-command; breakdown in the ethos and substance of customer service; and fostering a climate of dissension and distrust within the Army Knowledge Network Directorate." *Id*. at 22.[6]

On or shortly after June 27, Dr. Plotke's official termination form was submitted to Colonel William C. Ohl II, Chief of Staff at Fort Leavenworth, for his signature. Col. Ohl testified he "did not know any of the facts or circumstances surrounding the termination decision," and was told "there was no

_____

[6]Dr. Morris claimed he was told in July 1994 (prior to hiring Dr. Plotke) that Dr. Plotke applied for an historian position at Fort Leavenworth in late 1986 and misrepresented on her SF-171 form that she had completed her Ph.D. Dr. Plotke contends she properly indicated on the form that she expected to complete her Ph.D. in June 1987. Although Dr. Morris admitted the charge of SF-171 falsification was hearsay and no documentation supported such a charge, he testified the allegation was a "piece of the picture" and "provided a context that had some influence" in his losing trust in Dr. Plotke and ultimately terminating her. Aplt. App. at 182-83, 717. Dr. Morris further acknowledged that he failed to inform Dr. Plotke of these allegations, in violation of Office of Personnel Management (OPM) regulations governing the rights of federal career-conditional employees during their one year probationary period. *See* 5 C.F.R. § 315.805 (requiring advance written notice with specific and detailed reasons for termination and an opportunity to respond "[w]hen an agency proposes to terminate an employee serving a probationary or trial period for reasons based in whole or part on conditions arising before his appointment").

documentation to support the termination." *Id*. at 526. The Colonel "was not comfortable approving a termination without valid reasons and documentation," but did so because Department of Defense personnel and legal advisors told him that "federal regulations permitted the termination of a probationary employee during the probationary period without cause and without documentation." *Id*. Col. Ohl insisted that he "personally meet with Dr. Plotke to inform her of the termination decision" because he was the approving official. *Id*.

While preparing for his meeting with Dr. Plotke, Col. Ohl requested Dr. Morris to forward his counseling files concerning Dr. Plotke. Dr. Morris' response that he had no files or documentation to support the termination made the Colonel suspicious, as he had never approved a termination absent a well-documented counseling file. Col. Ohl therefore met with Dr. Morris and Dr. Lackey, who both reported that Dr. Plotke had lied or at least was "trying to pull a fast one" regarding her attendance at the Canada conferences. *Id*. at 526-27. Neither Dr. Morris nor Dr. Lackey presented any other reason to Col. Ohl for dismissing Dr. Plotke from her position.

After his meeting with Dr. Morris and Dr. Lackey, Col. Ohl met with Dr. Plotke to discuss the termination decision. Dr. Plotke provided the Colonel with her version of the TDY incident and described various other episodes that had occurred during her employment. Dr. Plotke reported the following to Col. Ohl:

-11-

"arrangements had been made for her to go out on a date with Dr. Lackey" (which she politely refused); Dr. Morris' and Dr. Lackey's treatment toward her seemed to worsen subsequent to that refusal; "she was referred to by Dr. Morris, Dr. Lackey, and George Mordica as 'Jane' and male historians were referred to as 'Dr. [last name]' in office meetings or introductions"; and "during an office meeting with Dr. Morris, and in her presence, Dr. Lackey had removed his shoes and socks and picked his toes." *Id*. at 527. Dr. Plotke also reported that Dr. Lackey fondled his genitals at the same meeting.

Colonel Ohl was "appalled by this information" and by Dr. Plotke's report that she had never been counseled by either Dr. Lackey or Dr. Morris for any problems prior to the TDY incident. *Id*. As a result, he decided to investigate Dr. Plotke's claims by conferring with other employees. According to Col. Ohl, Dr. Plotke's allegations "were confirmed." *Id*. Col. Ohl arranged another meeting with Dr. Morris and Dr. Lackey during which the doctors themselves confirmed many of Dr. Plotke's allegations.[7] Dr. Morris and Dr. Lackey also reported to Col. Ohl that "Dr. Plotke very well may not have attempted to deceive them concerning the TDY incident and that they had no real solid proof that that was her intent."

_____

[7]The doctors confirmed that "a date between Dr. Plotke and Dr. Lackey had been arranged"; "they and George Mordica frequently addressed [Dr. Plotke] as 'Jane' . . . and saw nothing inappropriate about doing so even though they addressed the male historians by Dr."; and "Dr. Lackey had picked his toes in Dr. Plotke's presence during an office meeting with Dr. Morris." Aplt. App. at 527.

*Id.*[8]

Based on his investigation, Col. Ohl believed that Dr. Plotke was unfairly terminated and attempted to convince the CPO and the staff judge advocate to reverse the termination decision. The decision was not reversed, however, due to concerns that reinstatement would have an adverse impact on Dr. Plotke's then pending EEO discrimination and retaliation charges, which ultimately led to the instant action. According to Col. Ohl, at no time before or after Dr. Plotke's termination did Dr. Morris or Dr. Lackey state to him that Dr. Plotke's position was being eliminated or was actively being considered for elimination.

In mid-July 1995, after Dr. Plotke's termination, Dr. Morris met with General Mountcastle and Lt. Col. Deitrich, both from the Army Center for Military History, to convince them to reassign a new Gulf War computer digitalization project to Dr. Morris' department. Dr. Morris knew that Lt. Col. Dietrich was very interested in hiring Dr. Plotke and that Dr. Plotke had applied for the position. Dr. Morris approached Lt. Col. Dietrich, unsolicited, and threatened to cut off all cooperation with the project if Lt. Col. Dietrich hired Dr. Plotke. Dr. Morris told Lt. Col. Dietrich that he terminated Dr. Plotke because he "had lost trust in her in terms of the TDY incident" and "it would be best not to retain her

---

[8]Dr. Lackey received praise in his March 1996 written performance evaluation for recommending the termination of Dr. Plotke. Dr. Morris prepared the evaluation which was eventually signed by Dr. Lackey's senior rater, Col. Robinette.

beyond the probationary period." *Id.* at 718-19. Lt. Col. Dietrich was "deeply disturbed by Dr. Morris' comments and viewed them as a clear threat to take retaliatory action if [he] did not heed his warning." *Id*. at 524.

The district court granted summary judgment for the Army on the ground that Dr. Plotke failed to establish a prima facie case of employment discrimination because she did not demonstrate her position still existed after her discharge. Alternatively, assuming *arguendo* that a prima facie case was satisfied, the court held the Army had articulated a legitimate, nondiscriminatory reason for terminating Dr. Plotke, her allegedly unsatisfactory conduct, and that Dr. Plotke failed to raise a genuine issue of material fact with respect to whether the proffered reason was a pretext for gender discrimination. We address each issue in turn.

## II.

When a plaintiff relies on circumstantial evidence to prove employment discrimination, we apply the three-step burden-shifting framework set forth in *McDonnell Douglas* and its progeny. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 800-07 (1973). *McDonnell Douglas* first requires the aggrieved employee to establish a prima facie case of prohibited employment action. *Id*. at 802. The "burden of establishing a prima facie case . . . by a preponderance of the

evidence" is "not onerous." *McCowan v. All Star Maint., Inc.*, 273 F.3d 917, 922 (10th Cir. 2001); *see also Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). Furthermore, "[t]his burden is one of production, not persuasion; it can involve no credibility assessment." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 142 (2000) (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993)). If the employee makes a prima facie showing, the burden shifts to the defendant employer to state a legitimate, "nondiscriminatory reason" for its "adverse employment action." *Wells v. Colo. Dep't of Transp.*, 325 F.3d 1205, 1212 (10th Cir. 2003). If the employer meets this burden, then summary judgment is warranted unless the employee can show there is a genuine issue of material fact as to whether the proffered reasons are pretextual. *Jones v. Denver Post Corp.*, 203 F.3d 748, 756 (10th Cir. 2000).

With respect to Ms. Plotke's prima facie case, the district court, citing *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1229 (10th Cir. 2000), required Dr. Plotke to show that she (1) belonged to a protected class; (2) was qualified for her position; (3) was discharged; and (4) her position was not eliminated after her discharge. Dr. Plotke established the first three elements of a prima facie case of gender discrimination, but the district court concluded she failed to establish the fourth element because she did not show her job remained after her discharge. We disagree with the district court's fourth element analysis.

-15-

The Supreme Court recognized in *McDonnell Douglas* that the articulation of a plaintiff's prima facie case may well vary, depending on the context of the claim and the nature of the adverse employment action alleged. 411 U.S. at 802 n.13; *see also Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 358 (1977) (emphasizing prima facie case is a flexible standard that may be modified to accommodate different factual situations); *Stone v. Autoliv ASP, Inc.*, 210 F.3d 1132, 1139 (10th Cir. 2000) ("The prima facie case was never intended to be rigid, mechanized or ritualistic.") (citations and quotations omitted). The essential purpose served by the prima facie case, however, remains the same and "serves an important function in the litigation: it eliminates the most common nondiscriminatory reasons for the plaintiff's [adverse employment action]." *Burdine*, 450 U.S. at 253-54. The most common nondiscriminatory reasons for discharge in a termination case are (1) "lack of qualification" or (2) "elimination of the job." *Kendrick*, 220 F.3d at 1229. Neither of these reasons were proffered by the Army as the legitimate business reason for Dr. Plotke's termination. Rather, the Army admits Dr. Plotke was highly and uniquely qualified for the position she held and claims the nondiscriminatory reason for its decision to terminate her was unsatisfactory conduct.

While we have held that *one way* a plaintiff may establish a prima facie case is to include evidence that her job was not eliminated after her discharge, we have

-16-

also noted that "[t]he elimination of the position . . . does not necessarily eviscerate a plaintiff's claim that her discharge was . . . motivated [by discrimination]." *Perry v. Woodward*, 199 F.3d 1126, 1140 n.10 (10th Cir. 1999). "The critical prima facie inquiry in all cases is whether the plaintiff has demonstrated that the adverse employment action occurred 'under circumstances which give rise to an inference of unlawful discrimination.'" *Kendrick*, 220 F.3d at 1227 (quoting *Burdine*, 450 U.S. at 253). There must simply be a logical connection between each element of the prima facie case and the inference of discrimination. *Id.* (citing *O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 311-12 (1996)).

Thus, contrary to the district court's implicit holding that the elimination of Dr. Plotke's position was *per se* fatal to her case, the fourth element of a prima facie case is a flexible one that can be satisfied differently in varying scenarios. *See Hysten v. Burlington Northern & Santa Fe Railway Co.*, 296 F.3d 1177, 1181 (10th Cir. 2002) (while "*McDonnell Douglas* defines the prima facie elements for the *archetypal* discrimination case" the facts of a given case dictate the measure by which the *McDonnell Douglas* and corresponding *Kendrick* tests should be applied; "the Supreme Court . . . emphasized that *McDonnell Douglas* was never intended to set an inflexible rule") (emphasis added); *Kendrick*, 220 F.3d at 1227 n.6 ("Collapsing the four-part prima facie case of *McDonnell Douglas* into a three-

part test may occasionally be helpful when addressing discrimination claims that either do not fall into any of the traditional categories . . . or *present unusual circumstances.*") (emphasis added); *Chertkova v. Connecticut Gen. Life Ins.*, 92 F.3d 81, 91 (2d Cir. 1996) ("there is no unbending or rigid rule about what circumstances allow an inference of discrimination when there is an adverse employment decision"). Requiring Dr. Plotke to present evidence that her position remained open subsequent to her discharge when her employer never even asserted she was terminated because her position was eliminated is especially problematic. Indeed, where an employer contends the actual reason for termination in a discriminatory firing case is not elimination of the employee's position but, rather, unsatisfactory conduct, the status of the employee's former position after his or her termination is irrelevant.[9]

---

[9]In any event, Dr. Plotke's evidence raises a genuine issue of material fact concerning whether her position was actually eliminated. For instance, Dr. Lackey testified that Dr. Plotke's job was not eliminated when she was terminated. Aplt. App. at 594. Significantly, at no time before or after Dr. Plotke's termination did Dr. Morris or Dr. Lackey report to Col Ohl – the ultimate decision maker – that Dr. Plotke's position was being eliminated or was being actively considered for elimination. *Id*. at 527.

The evidence also indicates that several months after Dr. Plotke's termination, all of the historian positions in Dr. Morris' department were effectively eliminated but then realigned to the Army Network Knowledge Directorate (AKND), with Dr. Plotke's former position being the only one not reestablished in the AKND. As noted in *Atchley v. Nordam Group, Inc.*, 180 F.3d 1143, 1147-49 (10th Cir. 1999), we view with suspicion a corporate restructuring justification used to counter a discrimination claim where the plaintiff's position was the only one eliminated.

(continued...)

Having relied on its argument that a Title VII discriminatory termination prima facie case must include proof that the employee's job was not eliminated, the Army does not assert that Dr. Plotke's proof is otherwise insufficient for a prima facie case. In fact, Dr. Plotke presented ample evidence to permit an inference of discrimination in her dismissal. To satisfy her *de minimis* prima facie burden, Dr. Plotke only needed to demonstrate that her termination occurred "under circumstances which give rise to an inference of discrimination." *Kendrick*, 220 F.3d at 1227. Courts have enumerated a variety of circumstances that can give rise to an inference of discriminatory motive, including:

---

[9](...continued)

In addition, Dr. Morris acknowledges that after he dismissed Dr. Plotke, her duties were assumed by Dr. Lackey and Mr. Mordica. We have rejected an employer's argument that no inference of discrimination can be drawn where an employee's position was eliminated and his duties were divided among other employees not in the protected class. *Abuan v. Level 3 Communications, Inc.*, 353 F.3d 1158, 1169 (10th Cir. 2003). Like *Abuan*, the instant case does not involve a reduction in force (RIF). Dr. Morris' department and mission was expanding rapidly in the months prior and subsequent to Dr. Plotke's termination and the CTC team was "short-handed" of personnel. Aplt. App. at 703, 704, 891. Moreover, the Army, similar to the defendant employer in *Abuan*, asserts that its reason for terminating Dr. Plotke was unsatisfactory performance, not elimination of her position. *See* 353 F.3d at 1169. Finally, the plaintiff in *Abuan* presented evidence that he was qualified for his position and he was replaced by three less qualified individuals outside the protected class. *Id.* Dr. Plotke has made a similar showing. In fact, Dr. Morris testified that subsequent to Dr. Plotke's termination her "functions" were "executed by combination of Lackey [and] Mordica." *Id.* at 854. For the foregoing reasons, Dr. Plotke has created a genuine factual dispute concerning whether her position was actually eliminated or otherwise filled.

-19-

actions or remarks made by decisionmakers that could be viewed as reflecting a discriminatory animus . . . , preferential treatment given to employees outside the protected class . . . , in a corporate downsizing, the systematic transfer of a discharged employee's duties to other employees . . . , or a pattern of recommending the plaintiff for positions for which she is not qualified [or over-qualified] and failure to surface plaintiff's name for positions for which she is well-qualified. A plaintiff might also rely upon the fact that the defendant, following plaintiff's termination, continued to seek applicants to fill the position, . . . or, more generally, upon the timing or sequence of events leading to plaintiff's termination.

*Chertkova*, 92 F.3d at 91 (listing cases).

Among the many facts recited earlier in this opinion, Dr. Plotke was the first and only female historian hired at Fort Leavenworth and Dr. Lackey informed her she was hired largely because of administrative pressures to employ a woman at the facility. Likewise, in contrast to her male counterpart, Dr. Bernstein, Dr. Plotke's job duties were generally limited to clerical and manual tasks, and she was prohibited from engaging in higher-level functions within the CTC-WIN due to the unexplained delay in delivering her security clearance. Many of her male colleagues, at least one of whom had not achieved the same level of education as she had, referred to her as Jane while referring to other male staff members with their academic titles of "Dr." Finally, despite her highly praised work and general personal satisfaction while assigned on the Haiti project, Dr. Plotke was removed from that project prior to its completion and reassigned to the CTC-WIN due to the purported urgencies and importance of that project, although the project was never completed. Dr. Plotke's reassignment to CTC-WIN assured that she was under the

supervision of Dr. Morris and therefore subject to his review regarding whether to extend her employment beyond the one-year probationary period.

Taking all inferences from these facts in the light most favorable to Dr. Plotke, we easily conclude she made the *de minimis* showing required for a prima facie case of gender discrimination.

## III.

The district court held that the Army proffered the following legitimate, nondiscriminatory reasons for discharging Dr. Plotke: "unsatisfactory conduct including her failure to follow guidance issued by superiors, failure to follow established chains-of-command, a breakdown in her attitude toward customer service, and her fostering a climate of dissension and distrust within the Army Knowledge Network Directorate." *Plotke v. White*, 2002 WL 1461974, at \*3 (D. Kan. Jul. 2, 2002). This is sufficient to shift the burden to Dr. Plotke to show there is a genuine dispute of material fact as to whether the Army's proffered reasons for terminating her are pretextual. *Jones*, 203 F.3d at 756. Dr. Plotke contends the district court erroneously ignored her evidence of pretext and intentional discrimination and failed to view the evidence in a light most favorable to her, as it is obligated to do under Rule 56. We agree the court disregarded evidence favorable to Dr. Plotke and failed to draw all inferences in her favor.

"[A] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Reeves*, 530 U.S. at 148; *see also Randle v. City of Aurora*, 69 F.3d 441, 453 (10th Cir. 1995).

> The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reasons will *permit* the trier of fact to infer the ultimate fact of intentional discrimination . . . .

*Hicks*, 509 U.S. at 511 (footnote omitted). A plaintiff can show pretext by revealing "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence . . . ." *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997) (quotation omitted); *see also Townsend v. Lumbermens Mut. Cas. Co.*, 294 F.3d 1232, 1242 (10th Cir. 2002).

> [T]he evidence which a plaintiff can present in an attempt to establish that a defendant's stated reasons are pretextual may take a variety of forms . . . . *A plaintiff may not be forced to pursue any particular means of demonstrating that a defendant's stated reasons are pretextual.* A plaintiff typically makes a showing of pretext in one of three ways: (1) with evidence that the defendant's stated reason for the adverse employment action was false . . . ; (2) with evidence that the defendant acted contrary to a written company policy prescribing the action to be taken by the defendant under the circumstances . . . ; or (3) with evidence that the defendant acted contrary to an unwritten policy or contrary to company practice when making the adverse employment decision affecting the plaintiff.

*Kendrick*, 220 F.3d at 1230 (citations and quotations omitted) (emphasis added). The plaintiff's evidence can also allow for an inference that the "employer's proffered non-discriminatory reasons [were] either a *post hoc* fabrication or otherwise did not actually motivate the employment action (that is, the proffered reason is a pretext)." *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994).

Dr. Plotke makes several arguments in support of her claim that the Army's justification for her discharge is pretextual. First, she contends the reasons for her termination other than the TDY incident were pretextual, post-hoc justifications. In support of this contention, Dr. Plotke offers evidence that before the TDY incident, neither Dr. Morris nor anyone on his behalf had formally counseled her on any performance deficiencies or misconduct issues. Dr. Plotke also points to the fact that neither Dr. Morris nor Dr. Lackey raised any other reason besides the TDY incident for relieving Dr. Plotke of her position to Col. Ohl, the ultimate decision-maker regarding termination. Moreover, Dr. Morris admitted as of June 20 (prior to the TDY episode) that both he and Dr. Lackey would have recommended Dr. Plotke be retained in permanent employment beyond her probationary period. Dr. Morris did not consult Dr. Gorell for his input on retaining Dr. Plotke in July, despite the fact that Dr. Gorell was her immediate supervisor from January through May 1995, and Dr. Morris conceded he believed that Dr. Gorell would have recommended Dr. Plotke's employment be extended.

Dr. Morris subsequently enhanced his reasons for terminating Dr. Plotke by referencing additional pre-June 20 incidents to support his decision, as detailed in the June 27 memo he prepared for Dr. Plotke regarding her dismissal.

The Army's post-hoc reasons for Dr. Plotke's termination, which predate the TDY incident, constitute evidence of pretext. *See Santiago-Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 56 (1st Cir. 2000) (pretext can be shown with after-the-fact justifications for termination decision); *Fuentes*, 32 F.3d at 764 (*post hoc* fabrication can be evidence of pretext); *see also Smith v. Chrysler Corp.*, 155 F.3d 799, 809 (6th Cir. 1998) ("[a]n employer's strategy of simply tossing out a number of reasons . . . in the hope that one of them will 'stick' could easily backfire . . . . [A] multitude of suspicious explanations may itself suggest that the employer's investigatory process was so questionable that any application of the 'honest belief' rule is inappropriate") (cited with approval in *Tyler v. RE/MAX Mountain States, Inc.*, 232 F.3d 808, 814 (10th Cir. 2000) (holding that when the plaintiff casts substantial doubt on many of the employer's multiple reasons, the jury could reasonably find the employer lacks credibility)).

The district court erred in the summary judgment stage by accepting as true the Army's assertion that "the travel authorization incident was only one of several incidents that plaintiff's supervisors considered in their decision to terminate plaintiff," *Plotke*, 2002 WL 1461974, at *4, when there was evidence on the record

to the contrary. Such a credibility determination is appropriately made only by the fact finder:

> It is not the purpose of a motion for summary judgment to force the judge to conduct a "mini-trial" to determine the defendant's true state of mind. So long as the plaintiff has presented evidence of pretext (by demonstrating that the defendant's proffered non-discriminatory reason is unworthy of belief) upon which a jury could infer discriminatory motive, the case should go to trial. Judgments about intent are best left for trial and are within the province of the jury.

*Randle*, 69 F.3d at 453.

Conflicting evidence regarding the point in time at which Dr. Morris made the decision to terminate Dr. Plotke contributes to her showing of pretext. When Dr. Morris met with Dr. Gorell and Ms. Darnell on either June 20 or June 21, 1995, Dr. Morris gave Dr. Gorell the impression that he had already made the decision to terminate Dr. Plotke and simply wanted a "rubber stamp" to support that decision. Aplt. App. at 563. Dr. Gorell testified that Dr. Morris said "in essence, he was going to fire Dr. Plotke." *Id.* at 557. Dr. Morris contends, to the contrary, that Dr. Plotke would have kept her job if she had been responsive to counseling and states that he decided to terminate Dr. Plotke subsequent to his counseling session with her. The district court held that Dr. Plotke did not raise a genuine issue of material fact demonstrating pretext because the "defendant's proffered reasons for terminating plaintiff do not depend on whether the decision to fire plaintiff was made before or after counseling." *Plotke*, 2002 WL 1461974,

at *4. We disagree.

The conflicting evidence concerning the timing of Dr. Morris' decision to fire Dr. Plotke coupled with the conflicting evidence regarding the reasons Dr. Morris decided to fire her raise credibility issues for the fact finder. As the Supreme Court has reaffirmed,

> [p]roof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive . . . . In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose.

*Reeves*, 530 U.S. at 147. If Dr. Morris' testimony concerning his timing and reasoning for terminating Dr. Plotke is "unworthy of credence," a reasonable jury could infer from "the falsity of [his] explanation" that Dr. Morris is "dissembling to cover up a discriminatory purpose." *Id*.

In addition, evidence of the fabrication of a June 22 memoranda and procedural irregularities regarding Dr. Plotke's termination constitute relevant evidence of pretext going to the termination decision. *See Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1217 (10th Cir. 2002) ("[E]vidence of pretext may include, . . . disturbing procedural irregularities (e.g., falsifying or manipulating [of relevant] criteria . . .") (quoting *Simms v. Oklahoma ex rel. Dep't of Mental Health & Substance Abuse Servs.*, 165 F.3d 1321, 1328 (10th Cir. 1999)); *Mohammed v. Callaway*, 698 F.2d 395, 401 (10th Cir. 1983) (pretext can

-26-

be shown by serious procedural irregularities). The record indicates that Dr. Morris and Dr. Lackey represented to Col. Ohl on or about June 27 that there was no documentation relating to any counseling sessions with Dr. Plotke or her termination. In contrast, Dr. Lackey claims that he submitted a written report of his "junior counseling session" with Dr. Plotke to Dr. Morris on June 22. Dr. Lackey's declaration also refers to a June 27 memorandum he prepared after Dr. Plotke's "senior counseling session," documenting his reasons for recommending not to extend Dr. Plotke beyond her probationary period. Based on Dr. Lackey's declaration, the district court rejected Dr. Plotke's argument that the June 22 memoranda was fabricated, finding that Col. Ohl simply would not have had personal knowledge of the June 22 memoranda because it was an "internal communication." *Plotke*, 2002 WL 1461974, at *4.

Contrary to the district court's conclusion, Dr. Plotke presented evidence that establishes a genuine issue of material fact concerning whether the memoranda was fabricated subsequent to her termination. Dr. Morris and Dr. Lackey *represented* to Col. Ohl *on or about June 27* that there was no documentation relating to any counseling sessions with Dr. Plotke or her termination. Whether Dr. Lackey's June 22 memoranda was an internal communication is irrelevant. Col. Ohl had personal knowledge regarding the existence or lack thereof of any counseling documents because he was a party to

the conversation in which Dr. Morris and Dr. Lackey represented that no such material existed. Consequently, Col. Ohl's declaration casts doubt on Dr. Lackey's credibility and creates an inference that Dr. Lackey fabricated documents dated prior to June 27 in order to build a file to support the termination decision, particularly since it is procedurally irregular for the Army to terminate personnel without well-documented counseling files. *Mohammed*, 698 F.2d at 401 (holding that "serious procedural irregularities" can support an allegation of pretext). In this regard, Col. Ohl noted he had never approved or been involved in any termination that did not include a well-documented counseling file and that Dr. Morris' and Dr. Lackey's admissions made him "suspicious." Aplt. App. at 526. These inconsistencies and deviations from normal Army procedure, especially when viewed in the aggregate with the other evidence proffered by Dr. Plotke, are "sufficient to raise a genuine doubt about [d]efendant's motivation . . . ." *EEOC v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1200 (10th Cir. 2000).

The timing and sequence of events leading up to Dr. Platke's firing are also evidence of pretext. Dr. Plotke provided evidence to support her contention that her sudden reassignment from the Haiti project back to CTC-WIN in mid-May 1995 was part of a pre-ordained plot to terminate her. Dr. Plotke's supervisor confirmed that her work on the Haiti project was "excellent" and testified that she was the only person with the technical expertise to do the job. Aplt. App. at 550.

Dr. Plotke's work on the Haiti project was also highly and publicly praised by Lt. Col. Dietrich. Despite Dr. Plotke's success on the project, Dr. Morris claimed there was an urgent need in mid-May to transfer Dr. Plotke from the Haiti detail to CTC-WIN. As noted previously, at the time of transfer, Dr. Plotke's work on the Haiti project was not complete and there was no deadline for the CTC-WIN project. In fact, Dr. Morris admitted that the CTC-WIN project was *never completed* subsequent to Dr. Plotke's termination. Dr. Morris also conceded he transferred Dr. Plotke only after being informed that her one-year probationary period was nearing its completion and that he would have to certify her for continued employment beyond that period. And he admitted he believed Dr. Gorell would have recommended an extension to Dr. Plotke's employment at the time of the transfer, which would have provided her protection against termination under federal regulations.

In addition to her hasty reassignment back to CAC-WIN, Dr. Plotke claims that the TDY incident was totally contrived and grossly exaggerated. Dr. Morris admitted that before the TDY episode, both he and Dr. Lackey would have recommended Dr. Plotke be retained in permanent employment beyond her probationary period. Dr. Morris says the TDY incident caused him to lose trust in Dr. Plotke because (1) Dr. Gorell, rather than Dr. Lackey, had signed Dr. Plotke's TDY form; (2) Dr. Plotke had requested approval for conferences scheduled in

different weeks; and (3) Dr. Plotke had failed to obtain advance approval from Dr. Lackey to take annual leave following the Canada conference. But Ms. Darnell, not Dr. Plotke, was entirely responsible for the administrative error of submitting Dr. Plotke's TDY request to Dr. Gorell rather than Dr. Lackey. Dr. Morris admitted Dr. Lackey's memo was not clear in conveying its alleged intent and guidance that Dr. Plotke should choose two sessions within the same week. And Dr. Lackey's e-mail to Dr. Morris noting that Dr. Plotke would probably apply for annual leave so she could attend additional conferences supports her claim that Dr. Morris and Dr. Lackey expected her to take leave in conjunction with the conference. Dr. Lackey further admitted he had never rejected an employee's request for annual leave, he "[m]ost likely" would have approved Dr. Plotke's leave, and he had no reason to believe that Dr. Morris would have decided otherwise. *Id.* at 715.[10]

Most importantly, Dr. Morris and Dr. Lackey admitted to Col. Ohl that Dr. Plotke "*very well may not have attempted to deceive them*" and that they "*had no real solid proof that was her intent.*" *Id.* at 527 (emphasis added). Courts view with skepticism the use of subjective evaluations in making termination decisions. *See, e.g., Garrett*, 305 F.3d at 1217-18 (holding that subjectivity by decision

---

[10]Dr. Lackey himself had taken leave in Austria in conjunction with TDY assignment in Germany in April 1995, during a "very hectic, changing time" for the CAC History Department and without objection from Dr. Morris. Aplt. App. at 589.

maker in termination decision is relevant evidence of pretext); *Simms*, 165 F.3d at 1328 ("Evidence of pretext may include . . . the use of subjective criteria."); *Bauer v. Bailar*, 647 F.2d 1037, 1046 (10th Cir. 1981) (although subjective criteria not wrongful *per se*, "[o]bviously subjective decision making provides an opportunity for unlawful discrimination"); *see also Bergene v. Salt River Project Agric. Improvement & Power Dist.*, 272 F.3d 1136, 1142 (9th Cir. 2001) (subjective criteria evidence of pretext); *Burrus v. United Tel. Co. of Kansas, Inc.*, 683 F.2d 339, 342 (10th Cir. 1982) (subjective employment criteria may provide opportunities for unlawful discrimination). The Army has not denied that Dr. Lackey's and Dr. Morris' evaluation of Dr. Plotke's intent was wholly subjective. The inconsistencies and contradictions noted above raise disputed issues of fact as to whether the TDY incident was even a reason for Dr. Morris' and Dr. Lackey's actions towards Dr. Plotke. *See Garrett*, 305 F.3d at 1219; *Morgan*, 108 F.3d at 1323. On this record, a jury could reasonably infer the Army discriminated against Dr. Plotke by suddenly reassigning her from the Haiti Project to CAC-WIN and then contriving and grossly exaggerating the TDY incident as a means of exercising gender animus towards her.

Dr. Plotke's final contention is that the district court erred by rejecting as irrelevant to the pretext issue her evidence of several incidents not directly related to the termination decision. These incidents include but are not limited to:

referring to Dr. Plotke as "Jane" instead of "Dr."; calling her a "femi-Nazi" and "wire-head," aplt. app. at 315-16, 522, 631; advising her that she "should be quiet and not make [her]self noticed," *id.* at 316; remarking that her presence would prevent the all-male group from "sitting around drinking beer, smoking cigars, and farting" on a professional staff ride, *id.* at 521, 1028; comments that CAC was under pressure to hire a female historian; and disparaging Dr. Plotke's professional competence and yelling at her to "keep [her] mouth shut" in the presence of her peers and supervisor. *Id.* at 330. The district court held that these incidents "do not constitute direct evidence of gender discrimination," *Plotke*, 2002 WL 1461974, at \*5, and that under *McDonnell Douglas*, they would only be considered if offered as pretext evidence on the issue of the falsity of defendant's stated reasons for termination. We disagree.

On a motion for summary judgment, the district court is required to review the record "taken as a whole." *Reeves*, 530 U.S. at 150. Plaintiffs are not precluded from introducing "quite probative evidence of earlier acts of discrimination to support a claim of current discriminatory intent," even if prior events are beyond the limitations period. *Goodwin v. General Motors Corp.*, 275 F.3d 1005, 1012-13 (10th Cir. 2002) (quotation and citation omitted); *see also Bazemore v. Friday*, 478 U.S. 385, 402 n.13 (1986) ("evidence of pre-Act discrimination is quite probative"); *Noland v. McAdoo*, 39 F.3d 269, 271-72 (10th

Cir. 1994) (prior events not actionable may provide relevant circumstantial evidence to explain later, actionable events).

The Supreme Court has emphasized that courts should not reject a plaintiff's evidence of additional circumstantial gender-based comments and treatment simply because they "were not made in the direct context of [the plaintiff's] termination." *Reeves*, 530 U.S. at 151-53. Accordingly, we have held that gender-based comments by a plaintiff's supervisor can be relevant evidence of pretext demonstrating that the supervisor had "preconceived notions premised on [the plaintiff's] gender" and "ultimately terminated her based at least in part on his gender bias," even where such comments were not directly limited to the termination decision. *Stone*, 210 F.3d at 1140-41 (discussing *Tomsic v. State Farm Mut. Auto. Ins. Co.*, 85 F.3d 1472, 1477-79 (10th Cir. 1996)). A plaintiff simply must show a nexus between the allegedly discriminatory statements and the employer's decision. *Tomsic*, 85 F.3d at 1479.[11]

_____

[11]In *Tomsic v. State Farm Mut. Auto. Ins. Co.*, 85 F.3d 1472 (10th Cir. 1996), an employer made several comments to female employees from which the court determined an inference could be drawn that the employer subsequently discriminated against the employees based on their gender. *Id.* at 1479. The employer's comments included telling one employee that he did not think she would succeed because "her husband made too much money and that therefore she would lack incentive." *Id.* at 1474. He told another employee that she devoted too much time to her career and "that marital problems might arise in a few years because she would likely be earning more than her husband." *Id.* at 1475. The court rejected any argument that these comments were merely "stray remarks," *id.* at 1479, and determined a jury could infer from the comments in their total

(continued...)

Like the remarks at issue in *Tomsic*, the comments in the instant case made by Dr. Morris, Dr. Lackey and Mr. Mordica, were not random, "general," or "stray remarks," but were specifically directed to or about Dr. Plotke. *Id.* Moreover, Dr. Morris was Dr. Plotke's supervisor and ultimately decided to recommend that her employment not be extended beyond the probation period, relying heavily on the recommendations of Dr. Lackey and Mr. Mordica. We think there exists a sufficient nexus between these additional circumstantial comments and Dr. Plotke's termination. A reasonable jury could infer from the remarks of Dr. Morris, Dr. Lackey, and Mr. Mordica that unlawful gender bias was a motivating factor in Army's adverse employment decision.

In the context of this case it is also relevant that Dr. Plotke was the first and only woman ever employed as an historian at Fort Leavenworth. Evidence that Dr. Plotke was hired so that "the EEO office at Ft. Leavenworth would 'get off [CAC's] back,'" aplt. app. at 522, coupled with Dr. Lackey's delegation of clerical and administrative tasks to Dr. Plotke and the extravagantly delayed receipt of Dr. Plotke's security clearance, certainly raise questions concerning Dr. Morris' and Dr. Lackey's motives and intent in initially hiring Dr. Plotke. Finally, post-termination incidents including efforts to black-list Dr. Plotke's future

---

[11](...continued)
context that "unlawful bias was a motivating factor" in the employer's termination decisions. *Id.*

-34-

employment opportunities and the "praise" bestowed by Dr. Morris in his performance appraisal of Dr. Lackey for recommending Dr. Plotke's termination, present concrete evidence sufficient to permit a rational jury to conclude Dr. Plotke was discharged because of her gender. *See Robinson v. Shell Oil Co.*, 519 U.S. 337 (1997) (post-termination conduct directed against a former employee is actionable under Title VII).

In sum, we hold that Dr. Plotke has established a prima facie case of gender discrimination. She has also demonstrated genuine issues of material fact as to pretext that, under controlling precedent of this circuit, preclude the entry of summary judgment for the Army. We **REVERSE** the district court's decision to the contrary and **REMAND** for further proceedings consistent with this opinion.

02-3289, *Plotke v. White*

**TYMKOVICH**, J., concurring.

I concur in the result, but differ with the majority in two areas.

First, I conclude that reversal is necessary because there is a genuine issue of fact concerning whether Dr. Plotke's position was actually eliminated. *See Slip Op.* at n.9. I would not stray from the teaching of *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1229 (10th Cir. 2000), that a plaintiff bears the burden of showing that her position was not in fact eliminated after discharge. Here, I am satisfied that the evidence is uncertain enough as to whether the Army eliminated her position, and if so, whether the elimination occurred long enough after the alleged discriminatory conduct such that the *Kendrick* test has been met. In any event, it appears the Army has at no point argued that it in fact fired her because it was eliminating her position.

While I also agree that Dr. Plotke has shown enough "inconsistencies" and "contradictions" in the Army's proffered explanation of her termination to show disputed facts as to pretext, I differ with the majority's characterization of some of the evidence. Dr. Plotke is entitled to show at trial that the defendants were biased against her and made the termination decision because of her sex. But many of the examples showing pretext are generalized statements of personal dislike. Personal dislike does not necessarily equate with intentional discrimination. Although

statements or comments "may serve as circumstantial evidence of [pretext], the plaintiff must still show some nexus between the statements and the defendant's decision to terminate the employee." *Shorter v. ICG Holdings, Inc.*, 188 F.3d 1204, 1209-10 (10th Cir. 1999). I am confident that the district court at trial will be able to assess the relevancy of any proffered testimony to the alleged discriminatory conduct.