**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

JILLANN TURNWALL,

      Plaintiff - Appellant,

    v.

TRUST COMPANY OF AMERICA;
GEMISYS CORP., doing business as
Gemisys Financial Services; TC
ADVISORS NETWORK,

      Defendants - Appellees.

No. 04-1303
(D. Ct. No. 03-B-25(MJW))
(D. Colo.)

---

**ORDER AND JUDGMENT**[*]

---

Before **TACHA**, Chief Circuit Judge, **EBEL**, and **McCONNELL**, Circuit Judges.

Plaintiff-Appellant Jillann Turnwall sued her former employer,

Defendant-Appellee Trust Company of America, as well as Defendants-Appellees

Gemisys Financial Services and TCAdvisors Network, Inc. (collectively referred to as

"TCA") alleging (1) discrimination and retaliation in violation of the Family and Medical

Leave Act of 1993 ("FMLA"), 29 U.S.C. § 2601 et seq.; (2) discrimination, retaliation,

---

[*]This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. This court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

and hostile work environment in violation of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101 et seq.; (3) intentional infliction of emotional distress; and (4) breach of implied covenant of good faith and fair dealing. The District Court entered summary judgment in favor of TCA on all claims. Ms. Turnwall filed this timely appeal. We take jurisdiction under 28 U.S.C. § 1291 and AFFIRM.

## I. BACKGROUND

Ms. Turnwall began working for TCA on March 16, 1995 as a trader. In August 2000, she was promoted to the position of Mutual Fund Relationship Manager, and her immediate supervisor became John Hurley, the executive vice-president of the company. Mr. Hurley gave Ms. Turnwall favorable performance evaluations, although he did note that she needed to work on prioritizing assignments. Ms. Turnwall agreed with this assessment, stating in a January 2001 self-appraisal: "I lack severely in setting priorities and need to really work on that part. . . .[And I] tend to get a million things at once that all need done and I see myself jumping from one to the next and back and forth where I need to step back and look at the whole picture and learn how to prioritize . . . ."

In mid-March 2001, Ms. Turnwall notified Mr. Hurley that she would need to take leave pursuant to the FMLA so that her physician could screen for cancer cells that remained after an earlier diagnosis and treatment of thyroid cancer. Ms. Turnwall also informed him that, as part of the screening, she had to discontinue taking the thyroid hormone she had been on since the surgery, and that doing so could cause fatigue and

memory loss. Mr. Hurley responded that the company would "work through it" and to "keep him informed."

Around the same time, Ms. Turnwall's supervisor changed from Mr. Hurley to Phoebe Chambers. Because of Ms. Turnwall's need to improve her prioritization skills, Ms. Chambers met with her on March 29 to set goals and deadlines for an ongoing project. Ms. Chambers requested that Ms. Turnwall keep track of her daily activities in fifteen-minute intervals for seven days, work in her cubicle so Ms. Chambers could more closely supervise her, and inform Ms. Chambers of dates she would be out of the office.

Shortly after the March 29 meeting, Ms. Turnwall began to experience fatigue and memory loss, and it became apparent that she would not be able to meet her deadlines. Nevertheless, Ms. Turnwall did not seek a time extension to address the problem. Mr. Hurley and Ms. Chambers conducted a formal counseling session with Ms. Turnwall on April 10, during which they criticized her for failing to meet her deadlines. Ms. Turnwall claims that the meeting was "pretty nasty" and that they accused her of "dropping the ball."

Ms. Turnwall, who was already frustrated with Ms. Chambers' demands on her, also felt that Ms. Chambers was intentionally humiliating her in front of coworkers. For example, Ms. Turnwall claims that Ms. Chambers stated that certain people in the company needed to know Excel well—a comment that Ms. Turnwall believes was directed at her because she was not an expert at that computer program. Ms. Turnwall

also alleges that Ms. Chambers openly criticized her job performance which, on one occasion, caused her to cry; that Ms. Chambers commented on Ms. Turnwall's frequent absences in front of other employees; and that Ms. Chambers verbally reprimanded Ms. Turnwall for sending an e-mail regarding a project when such correspondence was Ms. Chambers' responsibility. Indeed, due to Ms. Chambers' behavior, some of her coworkers believed that Ms. Chambers wanted to fire Ms. Turnwall or force her to resign.

During this time, Ms. Turnwall began to take intermittent FMLA leave because of fatigue and memory loss caused by her discontinuation of thyroid hormone. She was absent from work on March 30 and April 5, and she worked a reduced schedule on April 9 and April 13. By April 16, she was no longer able to work at all and took leave until May 7.

When she returned to work on May 7, the atmosphere at the office had changed considerably. Ms. Chambers was much less regimented in her supervision of Ms. Turnwall. For example, and in contrast to the situation in late March and early April, Ms. Turnwall received no feedback—either positive or negative—regarding her performance. In addition, Ms. Chambers began to communicate with Ms. Turnwall primarily through e-mail. All in all, Ms. Turnwall described the office at this time as being "pretty quiet," although she still maintained—without reference to specific examples—that Ms. Chambers continued to be "nasty, mean, [and] vindictive."

Ms. Turnwall worked in this environment for two weeks, at which point she left

for a week-long vacation. Upon her return to work on May 30, she deposited her resignation notice on the human resource manager's desk. Making no mention of the treatment she endured, she thanked TCA for the experience that she gained and provided three weeks' notice of her resignation. During the following two weeks, Ms. Turnwall came in late and left early on several occasions without approval and without letting anyone know. She was also absent three days for non-FMLA-qualifying reasons. On June 13, Ms. Turnwall arrived late to work and left a note on the human resource manager's desk that read, "Due to the hostile work environment that I have been in I am not able to complete my 3 week [sic] notice. I am leaving the company effective immediately due to the circumstances I have been in."

Ms. Turnwall brought suit alleging four theories of liability: (1) that she was constructively discharged in violation of the FMLA; (2) that she was constructively discharged in violation of the ADA; (3) that TCA intentionally inflicted emotional distress on her; and (4) that TCA breached the implied covenant of good faith and fair dealing. The District Court entered summary judgment in favor of TCA on all claims. In her opening brief on appeal, Ms. Turnwall raises only the FMLA and intentional infliction of emotional distress claims,[1] arguing that the District Court erred when it concluded that the working conditions at TCA did not rise to a level necessary to support

---

[1]Issues not raised in a plaintiff's opening brief are considered waived. *Tran v. Trs. of the State Colls. of Colo.*, 355 F.3d 1263, 1266 (10th Cir. 2004).

those causes of action.

## II.  DISCUSSION

A.     <u>Standard of Review</u>

We review the District Court's entry of summary judgment de novo.  *Plotke v. White*, 405 F.3d 1092, 1093 (10th Cir. 2005).  Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  We view the evidence, and draw reasonable inferences therefrom, in the light most favorable to the nonmoving party.  *Plotke*, 405 F.3d at 1093–94.

B.     <u>FMLA</u>

We first address Ms. Turnwall's FMLA claim.  She argues that TCA violated the FMLA by (1) interfering with protected medical leave under the FMLA, *see* 29 U.S.C. § 2615(a)(1); and (2) retaliating against her for exercising her rights under the Act, *see* 29 U.S.C. § 2615(a)(2).  More specifically, Ms. Turnwall argues that TCA interfered with her right to reinstatement, *see Smith v. Diffee Ford-Lincoln-Mercury, Inc.*, 298 F.3d 955, 960 (10th Cir. 2002), and retaliated against her for taking FMLA leave, *see Chavez v. Thomas & Betts Corp.*, 396 F.3d 1088, 1104 (10th Cir. 2005), by constructively discharging her.

"Constructive discharge occurs when the employer by its illegal discriminatory

acts has made working conditions so difficult that a reasonable person in the employee's position would feel compelled to resign." *Sandoval v. City of Boulder*, 388 F.3d 1312, 1325 (10th Cir. 2004). In evaluating whether the employee's working conditions would cause such a feeling in a reasonable person, "we apply an objective test under which neither the employee's subjective views of the situation, nor her employer's subjective intent . . . are relevant." *Tran v. Trs. of State Colls. of Colo.*, 355 F.3d 1263, 1270 (10th Cir. 2004). "The question is not whether the employee's resignation resulted from the employer's actions, but whether the employee had any other reasonable choice but to resign in light of those actions." *Id.* The plaintiff's burden in a constructive discharge case is substantial and showing that the employer's conduct meets the definition of "tangible employment action" or "adverse employment action" is "not necessarily sufficient to establish a constructive discharge because a constructive discharge requires a showing that the conditions imposed by the employer are not only tangible or adverse, but intolerable." *Id.* at 1270–71; *see also Penn. State Police v. Suders*, 542 U.S. 129, —, 124 S. Ct. 2342, 2354 (2004) ("A hostile-environment constructive discharge claim entails something more [than conduct that amounts to actionable harassment]"); *Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1221 (10th Cir. 2002) (stating that "[t]he bar is quite high in such cases").

We agree with the District Court that the conduct Ms. Turnwall alleges does not amount to a constructive discharge. Though Ms. Chambers undoubtedly employs a

different managerial style than Mr. Hurley, her close supervision of Ms. Turnwall during Ms. Chambers' first three weeks as Ms. Turnwall's supervisor would not compel a reasonable person to resign. In light of Mr. Hurley's notation—and Ms. Turnwall's self-evaluation—that she needed to work on assigning priorities, it was reasonable to expect that Ms. Chambers would want to more closely oversee Ms. Turnwall's work and to assist her in time management by requiring her to keep a daily log of activities. The fact that Ms. Turnwall did not view Ms. Chambers' actions in this light and felt distressed by the situation does not suffice to establish a claim of constructive discharge under these circumstances. *See Tran*, 355 F.3d at 1271. Moreover, by the time Ms. Turnwall returned from FMLA leave, Ms. Chambers had ceased her micro-management, and Ms. Turnwall cannot recall any incidents involving Ms. Chambers or Mr. Hurley that caused her to resign. *Cf. Exum v. U.S. Olympic Comm.*, 389 F.3d 1130, 1135 (10th Cir. 2004) ("Plaintiff must show that, *at the time of his resignation*, his employer did not allow him the opportunity to make a free choice regarding his employment relationship." (emphasis added)).

While we have no doubt that Ms. Turnwall and Ms. Chambers had a personality conflict, and we are troubled by the fact that several of Ms. Turnwall's coworkers felt that Ms. Chambers wanted to fire Ms. Turnwall or encourage her to resign, we are reminded that in determining whether an employer's conduct amounts to a constructive discharge "we apply an objective test under which neither the employee's subjective views of the

-8-

situation, nor her *employer's subjective intent . . . are relevant*."[2] *Tran*, 355 F.3d at 1270

(emphasis added). For the same reason, and to the extent she makes such argument, Ms.

Turnwall's suggestion that she found her working conditions intolerable because of her

"weakened emotional condition" is irrelevant in our analysis. While Ms. Turnwall may

have been personally affronted, "not every unhappy employee has an actionable claim of

constructive discharge." *MacKenzie v. City and County of Denver*, 414 F.3d 1266, 1282

(10th Cir. 2005) (quotations omitted). Therefore, the District Court properly granted

summary judgment for TCA on the constructive discharge claim.

C.      Intentional Infliction of Emotional Distress

Under Colorado law, liability for intentional infliction of emotional distress "has

been found only where the conduct has been so outrageous in character, and so extreme in

degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious,

and utterly intolerable in a civilized community." *Coors Brewing Co. v. Floyd*, 978 P.2d

663, 666 (Colo. 1999) (quotation omitted) (holding as a matter of law that employer's

alleged conduct—instructing employee to conduct an illegal undercover investigation,

laundering money, and firing employee in order to cover-up employer's involvement in

---

[2]We emphasize that Ms. Turnwall's interference and retaliation claims fail because she fails to establish a genuine issue of fact as to whether she was constructively discharged. We note, to avoid any possible confusion, that while the employer's intent is irrelevant in determining whether its conduct amounted to a constructive discharge, it is highly relevant in determining whether an employee has established retaliation in violation of the FMLA. *See Chavez*, 396 F.3d at 1104 (plaintiff must show that reason for conduct was pretext for a retaliatory reason).

criminal activity—was not sufficiently outrageous to support employee's claim for intentional infliction of emotional distress).  In support of her claim for intentional infliction of emotional distress, Ms. Turnwall points to the same conduct that she alleged amounted to a constructive discharge.  We agree with the District Court that no reasonable jury could conclude that the evidence demonstrates the level of outrageousness required to create liability under Colorado law.

### III.  CONCLUSION

For the foregoing reasons, we conclude that Ms. Turnwall fails to raise a genuine issue of material fact as to either her constructive discharge claim or her outrageous conduct claim and therefore AFFIRM the District Court's grant of summary judgment in favor of TCA.

ENTERED FOR THE COURT,


Deanell Reece Tacha
Circuit Judge