**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

JODI ZISUMBO, formerly known as
Didier,

  Plaintiff-Appellant,

v.

McCLEODUSA
TELECOMMUNICATIONS
SERVICES, INC.,

  Defendant-Appellee.

No. 04-4119
(District of Utah)
(D.C. No. 2:03-CV-12-DS)

**ORDER AND JUDGMENT**[*]

Before **TACHA**, Chief Judge, **KELLY** and **MURPHY**, Circuit Judges.

## I. INTRODUCTION

Jodi Zisumbo appeals the district court's grant of summary judgment in

favor of McLeodUSA Telecommunications Services, Inc. ("McLeod"). Zisumbo

---

[*]This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata and collateral estoppel. The court
generally disfavors the citation of orders and judgments; nevertheless, an order
and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

filed a complaint in the United States District Court for the District of Utah alleging McLeod discriminated against her and subjected her to a hostile work environment based on her pregnancy in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-5(f). Zisumbo also raised pendent state-law claims for invasion of privacy and defamation. The district court concluded Zisumbo had failed to present a genuine issue of material fact and that McLeod was entitled to judgment as a matter of law on all claims set out in the complaint. *See* Fed. R. Civ. P. 56(c).

On appeal, Zisumbo contends as follows: (1) she produced sufficient evidence of pretext to send her disparate treatment claim to the jury; (2) she produced sufficient evidence from which a jury could find the existence of a hostile work environment; (3) she produced sufficient evidence to send her negligent training and supervision claim to the jury; and (4) she produced sufficient evidence from which a jury could conclude her working conditions were so intolerable that she was constructively discharged from her employment with McLeod. Exercising jurisdiction under 28 U.S.C. § 1291, this court **affirms** in part and **reverses** in part. The matter is **remanded** to the district court for further proceedings consistent with this opinion.

## II. BACKGROUND

*A. Factual Background*

McLeod hired Zisumbo as an account executive in December of 1999. Shortly thereafter, McLeod promoted Zisumbo to the position of senior account executive. In both positions, Zisumbo sold telecommunications services to businesses. As a senior account executive, Zisumbo earned a salary of $30,000 plus commissions on her sales.

During her tenure at McLeod, Zisumbo's direct supervisor was Kevin Nelson. Zisumbo and Mark Walker were the only two senior account executives on Nelson's sales team. Nelson's supervisor was Drew Peterson, the Director of Sales in the Major Account division. Both Nelson and Peterson reported to Robert Hatch, the Group Vice President for the Western Region.

Zisumbo first learned Nelson disapproved of the possibility of her getting pregnant in April of 2000. Nelson had invited Zisumbo and Walker to lunch to congratulate them on being the top performers on his team. After lunch, Nelson said to Zisumbo, "You are not gonna go and get pregnant now, are you, Jodi?" Zisumbo testified that she felt threatened by the remark and interpreted Nelson's comment as indicating he did not like pregnant women.

Approximately one month later, in May of 2000, Zisumbo learned she was pregnant. The next day, she called Nelson to tell him the news; Nelson responded

to the call with silence. Shortly thereafter, according to Zisumbo, Nelson's attitude toward and treatment of her changed considerably. For instance, Zisumbo asserts Nelson came into her office "out of the blue" and said, "Hey, your new nickname is going to be 'prego.'" Zisumbo estimated that over the remainder of her full-time employment at McLeod, Nelson referred to her as "prego" approximately 75% of the time. During his deposition, Nelson indicated he could not remember if he had referred to Zisumbo as "prego," but he did indicate he had called his wife "prego" during her pregnancy.

In addition to referring to her as "prego," Zisumbo asserts Nelson's treatment of her changed in other ways as well. During the first four or five months of Zisumbo's employment at McLeod, Nelson had accompanied her on cold calls to potential customers, and had felt comfortable enough with Zisumbo that on one such occasion he had taken a detour to show her his childhood home. Zisumbo testified that before her pregnancy, she "could do no wrong" in Nelson's eyes. By June the end of June 2000, however, Zisumbo's weight began to increase on account of her pregnancy, and Nelson's treatment of her was "night-and-day different compared to before" her pregnancy. According to Zisumbo, prior to becoming aware that she was pregnant, Nelson had never spoken to her in a loud or abusive tone. After he found out she was pregnant, however, Nelson became increasingly rude and demeaning, reaching a point where he was yelling

-4-

at her every time he talked to her.  Zisumbo asserts that when she confronted Nelson about his rude and abusive conduct, he told her to "quit" or "go on disability" if she could not handle the stress of her pregnancy.

In her deposition, Zisumbo stated she complained to McLeod about Nelson's behavior on three or four occasions.  On each occasion, Zisumbo telephoned McLeod's human resources department in Cedar Rapids, Iowa and spoke to Jennifer Hansen.  Zisumbo first complained to Hansen about Nelson's behavior on June 20, 2000.  Zisumbo contends McLeod did not initiate an investigation and Hansen did not follow up on her complaint.

Approximately one week later, on June 26, 2000, Zisumbo underwent a performance evaluation.  Nelson conducted the evaluation.  The evaluation was positive, particularly with regard to her sales results.  The evaluation did note, among other things, that Zisumbo needed to improve on her paperwork.

Despite this favorable performance evaluation, Zisumbo asserts Nelson continued to harass her and single her out because of her pregnancy.  Zisumbo asserts that on approximately July 21, 2000, Nelson again approached her about quitting work because of her pregnancy.  When Zisumbo responded by informing Nelson that he needed to quit harassing her, Nelson informed her that she was being demoted from a senior account executive to an account executive.  Zisumbo protested and immediately left work.  After she arrived home, she called both the

Utah Antidiscrimination and Labor Division and Hansen to complain about Nelson's conduct. Zisumbo asserts that, as was the case with the earlier call to Hansen, McLeod failed to follow up or investigate her complaints. Zisumbo claims she called Hansen for a third time in the beginning of August, "[t]o let them know what was going on." Zisumbo told Hansen she "was pregnant, and [] told her that [Nelson] was harassing [her] because of [her] pregnancy, and [she] would really like it if [Hansen] would talk to him or have someone speak to him because [she] — [she] couldn't have this going on any longer." According to Zisumbo, Hansen stated that she would talk to Nelson.

Toward the end of July of 2000, Zisumbo's doctor recommended that she be placed on indefinite bed rest because of complications from her pregnancy. Zisumbo apparently misunderstood her doctor's instructions, however, and continued working until August 8, 2000. On that day, Nelson issued Zisumbo a written warning on a document entitled "Disciplinary Action Form." The Disciplinary Action Form itemized Zisumbo's performance problems; informed her that from that day forward she would be expected to work out of the Farmington, Utah office with the rest of Nelson's sales team; and indicated that she was being placed on a performance plan because she constantly argued with peers and management, failed to employ adequately the "beat cop" method of selling, and failed to arrive at work on time. Zisumbo was particularly upset

-6-

about the required move to Farmington and viewed it as an attempt on the part of Nelson to force her to quit. According to Zisumbo, she had been allowed to continue working out of McLeod's Sandy, Utah office even after the rest of her team relocated to the Farmington office because the drive from her home to the Farmington Office would add an additional sixty minutes to her daily commute. Zisumbo called Hansen for the fourth and final time on August 8, 2000, to complain about the disciplinary action taken by Nelson. Hansen told Zisumbo she would talk to Nelson. Nevertheless, according to Zisumbo, McLeod never investigated her complaints about Nelson.

Zisumbo did not return to work at McLeod after August 8th. Instead, after being placed on permanent bed rest by her physician, she applied for and was granted paid disability leave for the remainder of her pregnancy. While on disability leave, McLeod paid Zisumbo $1335.00 every two weeks in short-term disability benefits. In October of 2000, however, she received a disability check that was approximately $335.00. Zisumbo stated in her deposition that when she contacted Hansen to report the error, she was informed that Nelson was responsible for the reduction in pay and that she should contact him directly. Although Zisumbo called and left a message on Nelson's cell phone, he never returned the call and the deficiency was never corrected.

Zisumbo gave birth to her fourth child on January 2, 2001. McLeod called Zisumbo and instructed her to return to work effective February 25, 2001. Apparently based on her history of poor treatment at the hands of Nelson, Zisumbo declined the request to return to work and resigned instead.

B. *Procedural Background*

On January 24, 2001, Zisumbo filed a charge of discrimination with the United States Equal Employment Opportunity Commission ("EEOC") alleging sex and pregnancy discrimination. In response to the charge, McLeod asserted Zisumbo was demoted because of poor job performance. In particular, McLeod asserted Zisumbo's demotion "was based on her poor performance with the 'back-end' sales process." In support of this assertion, McLeod contended that customers Linford Glass and Safehome Security had complained about Zisumbo's performance. In response to these assertions, Zisumbo submitted to the EEOC letters from both Linford Glass and SafeHome Security rejecting both the contention that Zisumbo's efforts to service their accounts had been unsatisfactory and that their service problems had been caused by clerical errors on the part of Zisumbo. After reviewing material submitted by both Zisumbo and McLeod, the EEOC concluded that McLeod's "reason for the demotion and transfer did not withstand scrutiny." After conciliation efforts on the part of the

EEOC failed, Zisumbo obtained a right-to-sue letter and filed suit in the United States District Court for the District of Utah.

During fact discovery, McLeod deposed Nelson's immediate supervisor, Peterson, and obtained the affidavit of Peterson's immediate supervisor, Hatch. Peterson and Hatch testified that at the time Zisumbo was employed at McLeod, company-wide reorganizations were common, typically occurring every six months; that Zisumbo's demotion was the result of one such reorganization; that higher-ups at McLeod had determined to reduce the number of senior account executives on Nelson's team from two to one based on changing needs in the western sales region; and that the decision to retain Walker as a senior account executive instead of Zisumbo was a "no-brainer based on Walker's demonstrably superior sales numbers."[1] Based on Peterson's testimony and Hatch's affidavit, McLeod changed its explanation for Zisumbo's demotion from "poor performance" to "corporate reorganization."

McLeod filed a motion for summary judgment. The district court granted the motion in full, dismissed Zisumbo's complaint with prejudice, and entered judgment in favor of McLeod. As to Zisumbo's disparate treatment claim, the district court concluded that McLeod had advanced a legitimate,

---

[1]From January to June, 2000, Walker brought in $46,322.91 in revenue, while Zisumbo brought in $16,997.94.

nondiscriminatory reason for demoting Zisumbo—the corporate reorganization and Walker's superior sales numbers—and that Zisumbo had failed to create a genuine issue of material fact regarding pretext. In so doing, the district court specifically concluded McLeod's changed statement as to the reason for Zisumbo's demotion, coming as it did after significant discovery, was insufficient to create a genuine question of fact about McLeod's current statement that it had demoted Zisumbo because of a need for corporate restructuring. The district court dismissed Zisumbo's hostile work environment claim on the basis that, although boorish and rude, Nelson's alleged conduct was not so severe or pervasive so as to create an objectively hostile work environment. The district court concluded Zisumbo's negligent-training-and-supervision claim failed (1) because McLeod had no duty to promulgate an antidiscrimination policy with a complaint mechanism and (2) Zisumbo's conclusory allegations about McLeod's failure to follow up on her complaints, unsupported by any evidence in the record about how McLeod actually responded, were insufficient to support a negligence claim. The district court dismissed Zisumbo's constructive discharge claim for the same reasons that it dismissed her hostile work environment claim.

### III. DISCUSSION

*A. Standard of Review*

This court reviews the district court's entry of summary judgment de novo. *Green v. New Mexico*, 420 F.3d 1189, 1192 (10th Cir. 2005). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "The moving party is entitled to summary judgment where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Penry v. Fed. Home Loan Bank of Topeka*, 155 F.3d 1257, 1261 (10th Cir. 1998) (quotation and alteration omitted). In applying this standard, "[w]e view the evidence, and draw reasonable inferences therefrom, in the light most favorable to the nonmoving party." *Green*, 420 F.3d at 1192.

*B. Analysis*

*1. Disparate Treatment Claim*

Title VII prohibits an employer from "discriminat[ing] against any individual with respect to [] compensation, terms, conditions, or privileges of

employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1).[2]

Because Zisumbo relies on circumstantial evidence to establish unlawful

discrimination, this court applies the three-step burden-shifting framework set

forth in *McDonnell Douglas* and its progeny. *McDonnell Douglas Corp. v.*

*Green*, 411 U.S. 792, 800-07 (1973); *Plotke v. White*, 405 F.3d 1092, 1099 (10th

Cir. 2005). Under this framework, the aggrieved employee must first establish a

prima facie case of prohibited employment action. *Plotke*, 405 F.3d at 1099. The

burden of establishing a prima facie case is not onerous; it is, instead, a simple

burden of production involving no credibility assessment. *Id.* "If the employee

makes a prima facie showing, the burden shifts to the . . . employer to state a

legitimate, nondiscriminatory reason for its adverse employment action." *Id.*

(quotation omitted). "If the employer meets this burden, then summary judgment

is warranted unless the employee can show there is a genuine issue of material

fact as to whether the proffered reasons are pretextual." *Id.*

For purposes of McLeod's summary judgment motion, the district court

assumed Zisumbo satisfied her initial burden of establishing a prima facie case of

sex discrimination. The district court then moved on to consider the second and

_____

[2]The overwhelming import of Zisumbo's allegations is that McLeod, through Nelson, discriminated against her on the basis of her pregnancy. Title VII makes clear, however, that the term "because of sex" in § 2000e-2(a)(1) includes discrimination "because of or on the basis of pregnancy, childbirth, or related medical conditions." 42 U.S.C. § 2000e(k).

third steps of the *McDonnell Douglas* framework. At the second stage of *McDonnell Douglas*, the district court concluded McLeod had met its burden of producing a legitimate nondiscriminatory explanation for its decision to demote Zisumbo from a senior account executive to an account executive: McLeod needed to reorganize its sales personnel by reducing the number of senior account executives and Walker was chosen to retain the sole remaining senior account executive position on Nelson's team because he had far superior sales figures than Zisumbo. Finally, at the third stage of *McDonnell Douglas*, the district court concluded Zisumbo had not created a material issue of fact as to pretext and, thus, McLeod was entitled to summary judgment.

On appeal, both Zisumbo and McLeod assume Zisumbo met her burden of establishing a prima facie case of discrimination and McLeod met its burden of producing a legitimate, nondiscriminatory reason for Zisumbo's demotion. Accordingly, both parties focus only on the question whether Zisumbo created a genuine issue of fact as to pretext, thereby precluding summary judgment. This court will likewise focus exclusively on that question.[3]

_____

[3]In the section of her brief on appeal labeled "Statement of Facts," Zisumbo asserts she was subject to four separate adverse employment actions after she informed Nelson she was pregnant. Nevertheless, in the section of her brief addressing the district court's grant of summary judgment to McLeod on her disparate impact claim, Zisumbo focuses exclusively on her demotion from senior account executive to account executive. Accordingly, in examining whether

(continued...)

"A plaintiff can show pretext by revealing such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence." *Plotke*, 405 F.3d at 1102 (quotation omitted). Although "the evidence which a plaintiff can present in an attempt to establish that a defendant's stated reasons are pretextual may take a variety of forms," Zisumbo's arguments on appeal mainly focus on evidence that McLeod's stated reason for her demotion is false. *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1230 (10th Cir. 2000) (quotation and alteration omitted)(noting that adducing evidence that an employer's stated reason for the adverse employment action is false is one of three ways employees typically make a showing of pretext). "[A] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the

---

³(...continued)
Zisumbo has created a genuine issue of fact as to pretext, this court likewise focuses exclusively Zisumbo's demotion. Any argument that the district court erred in granting McLeod summary judgment on Zisumbo's disparate treatment claim when viewed through the lens of an alternate adverse employment action is waived. Fed. R. App. P. 28(a)(9)(A) (providing that an appellant's brief must contain "appellant's contentions and the reasons for them with citations to the authorities and parts of the record on which the appellant relies). *See generally Hernandez v. Starbuck*, 69 F.3d 1089, 1093 (10th Cir. 1995) (discussing obligations imposed by Rule 28(a)(9)(A)).

trier of fact to conclude that the employer unlawfully discriminated." *Reeves v.*

*Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000).

> The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reasons will *permit* the trier of fact to infer the ultimate fact of intentional discrimination . . . .

*St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993); *see also Desert Palace,*

*Inc. v. Costa*, 539 U.S. 90, 100 (2003) (discussing *Reeves*).

On appeal, Zisumbo argues the district court erred in concluding she failed

to create a material issue as to whether McLeod's articulated nondiscriminatory

reason for the demotion, "corporate reorganization," was pretextual. In

particular, Zisumbo asserts a jury could conclude McLeod's stated reason is false

based on its abandonment and repudiation of the reason for the demotion given to

the EEOC. Appellant's Opening Brief at 26-27 ("Defendant's 'corporate

reorganization' explanation was so substantially divergent from the 'personal

performance' reasons alleged earlier, that it appeared Defendant was attempting

to discard a flawed defense in favor of another having better prospects."). In

support of her position, Zisumbo relies on this court's recent decision in *Miller v.*

*Eby Realty Group LLC*, 396 F.3d 1105 (10th Cir. 2005).[4]

---

[4]*Miller* was issued after the briefing was complete in this case.

(continued...)

In *Miller*, the jury found that the employer, Eby Realty Group LLC ("Eby"), discriminated against Miller in violation of the Age Discrimination in Employment Act. *Id.* at 1110. On appeal, Eby argued the district court erred in denying its motion for judgment as a matter of law. *Id.* According to Eby, "Miller failed to prove pretext because he did not sufficiently establish that Eby's [reduction-in-force ("RIF")] explanation was false, and that even if the jury disbelieved the RIF justification, the evidence was insufficient to infer that age discrimination motivated its decision." *Id.* at 1112. This court rejected Eby's arguments and held, in a passage particularly relevant to this appeal, as follows:

> Mr. Miller also produced evidence that Eby gave the EEOC a false reason for his termination. Eby stipulated at trial that Mr. Miller's performance was not a factor in its decision to fire him even though it had previously told the EEOC performance was a factor. Eby concedes, as it must, that this evidence suggests it gave a false reason to the EEOC, but the company argues this does nothing to prove that its other justification—RIF—was false. We disagree.
>
> One of the primary roles of the factfinder is to assess credibility in deciding how to view the evidence. *Lamon v. City of Shawnee, Kan.*, 972 F.2d 1145, 1159 (10th Cir. 1992) ("It is the jury's exclusive province to assess the credibility of witnesses and determine the weight to be given to their testimony."). Indeed, the jury in this case was instructed that it could consider credibility "in deciding the weight and credit" to give the evidence. The same principle applies here. The factfinder is entitled to infer from any "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the employer's proffered reasons for its action that

---

[4](...continued)
Nevertheless, Zisumbo submitted a letter to the court pursuant to Fed. R. App. P. 28(j) identifying *Miller* and noting its applicability to the issues raised on appeal.

the employer did not act pursuant to those reasons, *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997), and we can see no reason to limit this inference to the specific proffered reason suffering from an inconsistency. If the factfinder concludes that one of the employer's reasons is disingenuous, it is reasonable for it to consider this in assessing the credibility of the employer's other proffered reasons.

*Id.*

In response to Zisumbo's arguments, McLeod asserts that its "different explanations for the reassignment do not show a pretext for discrimination: rather, the record shows only that both reasons were correct, both reasons were legitimate business decisions, and neither reason was a pretext for discrimination." Appellee's Brief at 18. A major problem with this argument is that it represents a dramatic reversal of the position advanced by McLeod before the district court. In its reply memorandum in support of summary judgment, McLeod asserted Zisumbo's allegations regarding the pretextual nature of McLeod's statements to the EEOC were "immaterial because her reassignment was based on corporate readjustments of its sales teams and not on Zisumbo's performance." Appellant's App. at 411. That is, in seeking summary judgment, McLeod specifically disclaimed its previous assertion to the EEOC that the demotion was based on Zisumbo's poor performance in "back-end" sales duties.[5]

_____

[5]Instead, McLeod argued that Zisumbo (1) had not identified any authority for the proposition that it was bound by its prior statements to the EEOC; and (2)

(continued...)

Thus, it seems disingenuous for McLeod to now assert on appeal that its statement to the EEOC was a "correct," "legitimate business decision" supporting its demotion of Zisumbo.

In any event, there are genuine issues of material fact as to whether the reason McLeod proffered to the EEOC in support of its demotion of Zisumbo, i.e., poor performance with the "back-end" sales process, is a "correct" and "legitimate" statement of its reasons for Zisumbo's demotion. In its brief on appeal, the only evidence identified in support of its assertion that Zisumbo was demoted because of poor performance is Zisumbo's June 26, 2000 performance review. The identified evaluation did note Zisumbo needed to improve on her paperwork. Nevertheless, a jury could conclude Zisumbo's problems with paperwork were not that serious in light of the otherwise high scores received by

---

[5](...continued)
its change in position with regard to Zisumbo's demotion was occasioned by a change in counsel and the difficulty in tracking down those individuals at McLeod that had made the demotion decision. As to the first of these arguments, although *Miller* certainly does not indicate an employer is "bound" by prior statements regarding the reasons for an adverse employment action, it does provide that a change in explanation, accompanied by evidence that an original justification is false, could allow a jury to conclude that a second justification is likewise false. *Miller v. Eby Realty Group LLC*, 396 F.3d 1105, 1112 (10th Cir. 2005). As to its second argument, we note simply that although this evidence is relevant to a jury's determination as to whether the change in justification was made in good faith (i.e., there is a good reason it misstated the justification for Zisumbo's demotion before the EEOC), that argument certainly does not compel judgment in its favor as a matter of law.

Zisumbo in the evaluation.[6]  Furthermore, McLeod did not even rely on the

performance review in support of its statements to the EEOC concerning

Zisumbo's problems with "back-end" sales.  Instead, McLeod relied on its

assertions that Zisumbo had failed to adequately care for customers during the

"back-end" sales process, specifically identifying customers Linford Glass and

SafeHome Security.  As noted above, however, both Linford Glass and SafeHome

Security submitted letters to the EEOC stating that they were satisfied with

Zisumbo's performance and that the technical problems they had with McLeod

could not be blamed on Zisumbo.  *See supra* p. 8.

Given that (1) McLeod did not even argue below that its statement to the

EEOC was consistent with, and an alternate reason for, Zisumbo's demotion, and

that (2) there is a material issue of fact as to the accuracy and veracity of

McLeod's statements to the EEOC, this court concludes the district court erred in

_____

[6]The evaluation is set out in a "GRIP-R Grid."  On one axis of the grid, a score between .5 and 5.0 is obtained by averaging the individual scores for the four following components: growth, relationships, integrity, and passion.  On the other axis of the grid, a score of .5 to 5.0 is obtained based solely on results.  On the GRIP axis of the grid, the axis apparently affected by Zisumbo's paperwork problems, Zisumbo obtained a score of 4.0.  She received a similar score on the Results axis of the grid.  On the face of the evaluation, it appears that a score of 4.0 is considered a good score.  That is, on the results axis of the grid, Zisumbo's score of 4.0 was accompanied by the following comment: "SEE RESULTS. That's all I can say here.  Jodi gets results."  On the GRIP axis of the grid, Zisumbo received no score lower than a 3.5.  Thus, a jury could conclude the statements made by McLeod to the EEOC were untrue and, thus, a pretext for discrimination.

granting summary judgment in favor of McLeod on the question of disparate treatment. *See Reeves*, 530 U.S. at 148 ("[A] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated."); *Miller*, 396 F.2d at 1112 ("If the factfinder concludes that one of the employer's reasons is disingenuous, it is reasonable for it to consider this in assessing the credibility of the employer's other proffered reasons.").[7] In so doing, we fully recognize that at the time the district court

---

[7]This court recognizes that

> [t]he evidence establishing the prima facie case coupled with the jury's rejection of the employer's explanation will not always support a finding of discrimination, such as in cases where the "plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination occurred."

*Miller*, 396 F.3d at 1113 (quoting *Reeves*, 530 U.S. at 148). Because McLeod did not argue below, and does not argue on appeal, that it is entitled to summary judgment even assuming the relevance of its change in justification for Zisumbo's demotion, we do not address the issue. This court does note, however, that the record is not completely devoid of evidence controverting McCleod's assertion that it demoted Zisumbo because of the need to restructure its sales force. According to Zisumbo's testimony, Peterson, one of the individuals McLeod asserts made the demotion decision, was aware that she was pregnant and had expressed the following concern to her during a meeting in May: "I hope because of your pregnancy your productivity is not going to go down." Furthermore, in his deposition, Peterson discussed the ongoing reorganizations at McLeod and noted that the reshuffling of personnel usually resulted in employees being pushed downward during a reorganization. That is, as the number of allotted strategic sales executives was reduced, those left without a position moved down to senior account executives, thereby displacing senior sales executives, and starting the

(continued...)

-20-

granted summary judgment in McLeod's favor, it did not have the benefit of this court's decision in *Miller*. Nevertheless, *Miller* compels the outcome in this case.

## 2. Hostile Work Environment Claim

Zisumbo asserts the district court erred in granting summary judgment in favor of McLeod on her hostile work environment claim. In granting summary judgment in favor of McLeod, the district court determined a rational jury could not find the conduct alleged, even if proven true, was so severe or pervasive so as to create an objectively hostile work environment. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998) (holding that in order to be actionable under Title VII, "a sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so"). It is uncontested that Zisumbo has adduced sufficient evidence to create a genuine issue of fact as to whether she subjectively considered the working environment to be abusive on the basis of her pregnancy. Accordingly, on appeal, this court focuses on the

---

[7](...continued)
cycle over again. There is at least some question, however, as to whether this course occurred in Zisumbo's case. In her affidavit, Zisumbo averred that not only were there senior account executives and account executives on her sales team, but that there was also a major account executive. The major account executive on the team was a man. Zisumbo testified that although she was demoted, the man occupying the major account executive position was not demoted. A jury could infer from this series of events that this reorganization did not occur in the usual method as described by Peterson.

question whether Zisumbo's allegations, if true, amounted to an objectively abusive work environment.

"For a hostile environment claim to survive a summary judgment motion, a plaintiff must show that a rational jury could find that the workplace was permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *MacKenzie v. City & County of Denver*, 414 F.3d 1266, 1280 (10th Cir. 2005) (quotation and alteration omitted). "Severity and pervasiveness are evaluated according to the totality of the circumstances, considering such factors as the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Chavez v. New Mexico*, 397 F.3d 826, 832 (10th Cir. 2005) (citation and quotation omitted). In applying this standard, we are mindful of the Supreme Court's admonition that courts should "filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing." *Faragher*, 524 U.S. at 788 (quotation omitted).

Applying the standard set out above, this court concludes that Zisumbo's allegations, if proven true, amount to an objectively hostile work environment.

-22-

The conduct alleged by Zisumbo is both pervasive and severe. Zisumbo testified in her deposition that shortly after she told Nelson she was pregnant, he came into her office "out of the blue" and told her that her "new nickname is going to be 'prego.'" If Nelson had used that pregnancy-related epithet infrequently, this court might agree that a reasonable person would not find the working atmosphere hostile or abusive under the standards set out by the Supreme Court. *Id.; see also Carrero v. New York City Housing Auth.*, 890 F.2d 569, 577 (2d Cir. 1989) (holding that incidents of environmental sexual harassment "must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive"). Zisumbo testified, however, that Nelson used that epithet to refer to her in approximately 75% of their interactions over the three-month period after she disclosed to him that she was pregnant. We hardly think an employment situation in which an employee was called a racial epithet in 75% of her interactions with her direct supervisor would be considered anything other than "pervasive." *See Oncale v. Sundowner Offshore Servs. Inc.*, 523 U.S. 75, 78 (1998) (holding that in order to prove that alleged harassment is pervasive, the employee must demonstrate the workplace was "permeated with discriminatory intimidation, ridicule, and insult"). The result should be no different with a pregnancy-related epithet.

-23-

The allegations regarding Nelson's pervasive use of a pregnancy-related epithet do not stand alone. Zisumbo testified that within a month after she informed Nelson of her pregnancy, he began harassing her on a consistent basis. Zisumbo testified that "[e]very time I spoke to [Nelson] he would yell at me." Often, Nelson would suggest that Zisumbo quit or go on disability if she could not handle the stress of being pregnant. Zisumbo testified that she had never seen Nelson treat any other employee in that fashion and that he had never treated her in that fashion before she disclosed to him she was pregnant. Thus, not only did Nelson immediately begin referring to Zisumbo as "prego" upon learning of her pregnancy, he also began acting in a hostile and abusive manner to Zisumbo within a month of that announcement. Although this behavior was not overtly based on Zisumbo's pregnancy, "[f]acially neutral abusive conduct can support a finding of gender animus sufficient to sustain a hostile work environment claim when that conduct is viewed in the context of other, overtly gender-discriminatory conduct." *O'Shea v. Yellow Tech. Servs., Inc.*, 185 F.3d 1093, 1097 (10th Cir. 1999).

The evidence and reasonable inferences viewed in Zisumbo's favor are sufficient for a jury to conclude that Nelson's consistent use of a pregnancy-related epithet and campaign of abusive conduct were sufficiently severe and pervasive so as to change the conditions of Zisumbo's employment with McLeod.

*Id.* at 1098 (noting that "the severity and pervasiveness evaluation is particularly unsuited for summary judgment because it is quintessentially a question of fact." (quotation omitted)); *see also Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 22 (1993) ("A discriminatorily abusive work environment . . . can and often will detract from employees' job performance, discourage employees from remaining on the job, or keep them from advancing in their careers."). Furthermore, the extensive nature of the alleged conduct and the fact that the abusive conduct was allegedly undertaken by Zisumbo's direct supervisor is sufficient to distinguish this case from those relied on by McLeod on appeal. *See Shepherd v. Comptroller of Pub. Accounts*, 168 F.3d 871, 872 (5th Cir. 1999) (involving only intermittent sexually-suggestive comments by a co-worker where the employee attested that "she engaged in friendly discussions with [the alleged harasser] on almost a daily basis and had a friendly relation with him at work and outside of work"); *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 768 (2d Cir. 1998) (noting that hostile work environment claim had to be assessed solely on the basis of two minor alleged instances of harassment and concluding that the instances were "sufficiently isolated and discrete that a trier of fact could not reasonably conclude they pervaded [the plaintiff's] work environment"); *Penry*, 155 F.3d at 1261-63 (identifying no more than fifteen incidents involving two plaintiffs over the course of three years); *Skouby v. Prudential Ins. Co.*, 130 F.3d 794 (7th Cir.

1997) (involving discriminatory actions of co-workers, not supervisors). Accordingly, the district court erred in granting summary judgment in McLeod's favor on Zisumbo's claim that she was subjected to a hostile work environment.

   *3. Negligent Training and Supervision*

   In her complaint, Zisumbo asserted that Title VII imposes upon all employers a duty to promulgate antidiscrimination policies prohibiting unlawful discrimination and harassment in the workplace and setting up mechanisms to investigate and resolve complaints of discrimination. In granting summary judgment in favor of McLeod on this claim, the district court concluded as follows: (1) Title VII does not impose an affirmative duty on employers to promulgate antidiscrimination policies; and (2) even assuming such a duty does exist, Zisumbo failed to adduce sufficient evidence that McLeod had breached the duty. Because this court agrees with the first rationale relied upon by the district court in granting summary judgment in favor of McLeod, there is no need to consider the question of evidentiary sufficiency.

   In asserting that Title VII imposes upon McLeod a duty to promulgate an antidiscrimination policy, Zisumbo does not rely at all on the language of Title VII. This court's review of the statute reveals no language suggesting such a duty exists. 42 U.S.C. § 2000e *et seq.* Instead, Zisumbo relies exclusively on this

court's opinion in *Jeffries v. Kansas*, 147 F.3d 1220 (10th Cir. 1998). *Jeffries* is, however, inapposite.

The question in *Jeffries* was not whether the employer was independently liable in tort for failing to promulgate an antidiscrimination policy, but was, instead, whether the employer was responsible under Title VII for an allegedly hostile work environment created by one of the plaintiff's co-workers. *Id.* at 1128 ("[W]e need not decide whether the single incident of Mr. Hoyt's admittedly inappropriate hug created a hostile work environment for Ms. Jeffries because we hold that [the defendant employers] are not liable for his conduct or for failing to respond to it."). According to *Jeffries*,

> This court has set forth the following grounds for holding an employer liable for an employee's actions:
> An employer is liable for: (1) any tort committed by an employee acting within the scope of his or her employment; (2) any tort committed by an employee in which the employer was negligent or reckless; or (3) any tort in which the employee purported to act or speak on behalf of the employer and there was reliance upon apparent authority, or the employee was aided in accomplishing the tort by the existence of the agency relation.

*Id.* at 1228-29 (quoting *Hirase-Doi v. U.S. West Commc'ns, Inc.*, 61 F.3d 777, 783 (10th Cir. 1995)). *Hirase-Doi* makes clear that in limiting the situations in which an employer is liable for the harassing actions of one of its employees to the list of situations set out above, it was adhering to the Supreme Court's

-27-

statement that employers are not automatically liable for acts of sexual

harassment perpetrated by their employees. 61 F.3d at 783 (citing *Meritor Sav.*

*Bank, FSB v. Vinson*, 477 U.S. 57, 72 (1986) for following proposition: "the

Supreme Court explained that we should look to agency principles for guidance in

determining when an employer is liable for hostile work environment sexual

harassment by its employees in violation of Title VII"); *see also Meritor*, 477

U.S. at 72 ("[W]e do agree with the EEOC that Congress wanted courts to look to

agency principles for guidance in this area. . . . For this reason, we hold that the

Court of Appeals erred in concluding that employers are always automatically

liable for sexual harassment by their supervisors.").

Thus, far from creating an additional, independent avenue of employer tort

liability, *Jeffries* merely clarifies that proof of a hostile work environment is not

sufficient to prevail under Title VII. Instead, under the standard set out in

*Jeffries*, the plaintiff must also demonstrate that the employer is responsible for

the harassment under the agency principles identified above. 147 F.3d at 1228-

29.[8] Because neither the text of Title VII nor this court's decision in *Jeffries*

---

[8]Shortly after *Jeffries* was decided, the Supreme Court issued its decisions in *Bullington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998) and *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998). *Burlington* and *Faragher* reexamined the question of when an employer is responsible for sexual harassment perpetrated by one of its employees. *See Cadena v. Pacesetter Corp.*, 224 F.3d 1203, 1208-09 (10th Cir. 2000) (discussing *Burlington* and *Faragher*). The analysis of that
(continued...)

support Zisumbo's assertion of an independent duty on the part of McLeod to promulgate and implement antidiscrimination policies, and because Zisumbo has not identified any alternative source for such a duty, the district court properly granted summary judgment in McLeod's favor on Zisumbo's negligent-supervision-and-training claim.

### 4. Constructive Discharge

As a final matter, Zisumbo asserts the district court erred in granting summary judgment in McLeod's favor on her constructive discharge claim. "A constructive discharge occurs when a reasonable person in the employee's position would view her working conditions as intolerable and would feel that she had no other choice but to quit." *Tran v. Trustees of State Colleges*, 355 F.3d 1263, 1270 (10th Cir. 2004). In granting summary judgment in favor of McLeod, the district court concluded Zisumbo had failed to demonstrate that her working conditions were so intolerable that she had no alternative but to resign.

Zisumbo asserts that the record before the district court contained evidence of sufficiently intolerable working conditions upon which a reasonable jury could base a finding of constructive discharge. In support of this claim, Zisumbo asserts that she was subjected to both disparate treatment and a hostile work

---

[8](...continued)
question by this court in *Hirase-Doi* and *Jeffries* has been superceded by the analysis of the Supreme Court in *Burlington* and *Faragher*.

environment at McLeod and asserts that because there is a material issue of fact as to these matters there is also a material issue of fact as to the question of constructive discharge. This court has held, however, that "conduct which meets the definition of a 'tangible employment action' or 'an adverse employment action' is not necessarily sufficient to establish a constructive discharge because a constructive discharge requires a showing that working conditions imposed by the employer are not only tangible or adverse, but intolerable." *Tran*, 355 F.3d at 1270-71; *see also Tutman v. WBBM-TV, Inc/CBS, Inc.*, 209 F.3d 1044, 1050 (7th Cir. 2000) ("Working conditions for constructive discharge must be even more egregious than the high standard for hostile work environment because in the ordinary case, an employee is expected to remain employed while seeking redress." (quotations omitted)). This court, therefore, rejects Zisumbo's assertion that because she has created a sufficient issue of genuine fact to send her disparate treatment and hostile work environment claims to the jury she is necessarily entitled to take her constructive discharge claim to the jury as well.

Considered in light of the totality of the circumstances, this court concludes no reasonable jury could find Zisumbo's working conditions were so intolerable at the conclusion of her maternity leave that she had no option but to resign. It is true that Zisumbo has created an issue of fact as to whether she was demoted because of her pregnancy and has adduced sufficient evidence, if believed by the

jury, to support a determination that she was subjected to a hostile work environment. It must be recognized, however, that those actions had occurred many months prior to her resignation. Other than a single incident involving the docking of her disability pay, which also occurred approximately three months before she was asked to return to work, Zisumbo has pointed to no evidence in the record indicating what her working situation would be like should she return to McLeod.

Instead, Zisumbo asks this court to infer that the situation would be unchanged because she would return to a job in which Nelson was her supervisor. This assertion is not supported by any citation to the record. In fact, the record reveals that during this time frame, Nelson was transferred to Billings, Montana. Absent some evidence in the record that Zisumbo undertook an effort to investigate what her working situation would be like should she return to McLeod at the conclusion of her disability leave, no reasonable jury could find in her favor on a constructive discharge claim. *Cf. Woodward v. City of Worland*, 977 F.2d 1392, 1402 (10th Cir. 1992) (holding that because plaintiff never took advantage of a possible alternative to resignation, no reasonable jury could find plaintiff was constructively discharged). Hence, the district court properly granted summary judgment in McLeod's favor on this claim.

# IV. CONCLUSION

The district court's grant of summary judgment to McLeod on Zisumbo's disparate treatment and hostile work environment claims is **REVERSED**. The district court's grant of summary judgment to McLeod on Zisumbo's negligent training and supervision and constructive discharge claims is **AFFIRMED**. The matter is **REMANDED** to the district court for further proceedings not inconsistent with this opinion.

ENTERED FOR THE COURT


Michael R. Murphy
Circuit Judge