**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**June 1, 2012**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

GEOFFREY LARSON,

      Plaintiff-Appellant,

v.

UNITED AIR LINES,

      Defendant-Appellee.

No. 11-1313
(D.C. No. 1:09-CV-02745-RPM)
(D. of Colo.)

---

**ORDER AND JUDGMENT**[*]

---

Before **MURPHY**, **HARTZ**, and **TYMKOVICH**, Circuit Judges.

---

United Air Lines furloughed Geoffrey Larson from his manager position as a part of a wide-ranging corporate restructuring in 2008. Larson brought this lawsuit under Title VII and Colorado state law, alleging that UAL furloughed him on the basis of sex and sexual orientation. The district court granted UAL summary judgment.

We have jurisdiction under 28 U.S.C. § 1291 and affirm. Larson failed to produce evidence that UAL's decision to furlough him was based on anything

---

[*] This order and judgment is not binding precedent except under the doctrines of law of the case, res judicata and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

other than its need to reduce workforce as a result of a corporate restructuring, and that it did not prefer women over men in the process.

# I. Background

Larson began working at UAL in 1999, ultimately being promoted from his position as a customer service representative to an operating manager in the Denver station. Throughout his tenure at UAL, Larson identified himself as gay.

Larson's claims of discrimination arise from a series of events which began in December 2007. Around that time, an anonymous, type-written letter was found in the employee break room. The letter expressed concern that "a lot of management and supervisors new and old are homosexuals" (naming Larson and his female supervisor, as well as other individuals), and that a particular female employee had received preferential treatment as a result of her relationship with the supervisor. App. at 134. UAL commenced an investigation into the letter and invited Larson to be a part of the investigation, but he declined because he "felt harassed by the letter." *Id*. at 52. The general manager of the Denver station, Mike Scanlan, issued a response to the Denver employees stating that the letter was "malicious and inappropriate," and "wholly unacceptable" in light of UAL's "zero tolerance harassment and discrimination policy." *Id*. at 139. The author of the letter was never found.

The next incident Larson complains of happened a few weeks later. In an unrelated matter, a group of approximately 65 UAL employees sent a signed letter

to a number of managers above Larson, complaining about Larson's management style—mainly that he skipped briefings and preferred to observe his employees from his office via video instead of working directly with them. In part as a result of this letter, Larson was transferred laterally to a different management position. In his new role as the Manager of Business and Manpower Administration, Larson reported to Todd Sprague. Larson had known Sprague for several years because Larson's former partner was good friends with Sprague.

In April 2008, a second anonymous letter was distributed to "United Management." *Id*. at 156. The letter complained generally about agents "turn[ing] against each other" and "nasty letters," ultimately concluding that the problems stemmed from a lack of mutual respect. *Id.* The letter said that no one should care "what sexual preference you may have," because it has nothing "to do with the job [you] have been given." *Id.* The letter did not mention Larson personally. The author purported to be a customer service representative who merely "want[ed] to come to work and do the job for which" he had been hired and the letter was distributed to "United Management" generally, including a copy slipped under Larson's door. *Id.* The author closed by stating "[p]lease don't take this letter as negative. It is written with respect to all involved." *Id.* Larson reported the letter to Sprague and said that he "was feeling intimidated and harassed by yet another anonymous letter." *Id.* at 52. According to Larson, Sprague did not pursue any investigation into the letter because he did not view it

as derogatory and considered Larson's report to be an overreaction. *Id.* at 76. Larson admitted that the substance of the letter was not problematic, but rather, he did not "like working in an environment where" discussions of sexual orientation "continue[d] to happen." *Id.* at 75.

As part of his new responsibilities as the Manager of Business and Manpower Administration, in May 2008, Larson was tasked with conducting the bid process for union employee shifts. Sprague warned Larson to make sure that the process went smoothly because the previous bid process, prior to Larson's arrival in the unit, had included a number of errors. But despite Sprague's warnings, Larson used an incorrect seniority list, requiring UAL to redo the process and delay bidding by a week.

In the summer of 2008, UAL and other airlines faced serious financial pressures as a result of rising costs. It responded with a national reduction of its workforce, including a furlough of more than 1,000 employees.

In Denver, UAL determined that five of its eighteen managers at Larson's level were to be furloughed and commenced a process to identify which employees had the lowest performance rankings. Prior to the furlough, four left voluntarily, leaving only one position to be furloughed.

To decide which manager to furlough, UAL completed a performance review of each manager, ranking managers according to their experience in airport operations and cargo, field operations, and labor union relations, in

addition to their skills in meeting job requirements and leading people. Each review was completed by the direct manager of the employee, and then all of the managers met together to compare outcomes. Sprague completed Larson's evaluation, and Larson agreed that the assessment was "accurate" and that he did not disagree with "anything in any way that [Sprague] assessed" him. *Id.* at 88–89. Subsequent disclosure of the rankings indicated that Larson received the lowest score of the remaining managers at his level in Denver.

As a result of his review scores, Larson was furloughed in August 2008. As a member of the union, Larson was entitled to return to work as a customer service representative, but was immediately furloughed from that position for lack of seniority. Once Larson was notified of the management furlough, his attorney wrote a letter to UAL complaining of discrimination and retaliation.

After being furloughed, Larson brought three claims, alleging: (1) Title VII discrimination and retaliation; (2) Colorado state law discrimination and retaliation; and (3) violations of Colorado's off-duty conduct law. The district court allowed discovery and ultimately granted summary judgment on all claims.

## II. Discussion

We review the grant of summary judgment de novo, employing the same standards as the district court. *Twigg v. Hawker Beechcraft Corp.*, 659 F.3d 987, 997 (10th Cir. 2011). Summary judgment is only proper if the record shows "that there is no issue as to any material fact and that the moving party is entitled to

judgment as a matter of law."  Fed. R. Civ. P. 56(c); *Public Serv. Co. of Colo. v. Continental Cas. Co.*, 26 F.3d 1508, 1513–14 (10th Cir. 1994).

As a preliminary matter, it is worth noting that Larson's contention that his own testimony should be afforded significant weight as evidence in this matter is incorrect.  Citing Federal Rule of Evidence 701, Larson argues that, particularly in discrimination cases, opinions or inferences from lay witnesses should be permitted because the witness can often provide insight about the underlying circumstances at a defendant's business.  *See* Aplt. Br. at 11 n.2; *Gossett v. Okla. ex rel. Bd. of Regents for Langston Univ.*, 245 F.3d 1172, 1179 (10th Cir. 2001). But Larson ignores the fact that his testimony is filled with unsubstantiated allegations, rather than potentially admissible opinion testimony.

Typically, "[u]nsubstantiated allegations carry no probative weight in summary judgment proceedings"; thus, to defeat a motion for summary judgment, "evidence, including testimony, must be based on more than mere speculation, conjecture, or surmise."  *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875–76 (10th Cir. 2004) (finding that plaintiff's own speculation was not sufficient to defeat summary judgment); *see also Hester v. BIC Corp.*, 225 F.3d 178, 185 (2d Cir. 2000) (finding that "in an employment discrimination action, Rule 701(b) bars lay opinion testimony that amounts to a naked speculation concerning the motivation for a defendant's adverse employment decision").  Accordingly, as the

district court did, we consider only the portions of the record that could be considered admissible testimony under the Rules of Evidence.

Larson's complaint presented four claims for relief, which we address in turn.

### A.  Title VII Discrimination

Larson first argues that UAL discriminated against him on the basis of his sex.  He claims the company favored women managers over men, and that he was consequently furloughed because of his sex.

To prevail on a Title VII sex discrimination claim, Larson must first establish a prima facie case by showing that (1) he belonged to a protected class, (2) he was qualified for his position, (3) he suffered an adverse employment action, and (4) his position was not thereafter eliminated, or some other circumstances surrounding the adverse action, such as a decisionmaker's discriminatory remarks or preferential treatment toward employees outside the protected class, "give rise to an inference of discrimination." *Plotke v. White*, 405 F.3d 1092, 1099–1101 (10th Cir. 2005).  If he does this, the burden shifts to UAL to show that a valid non-discriminatory reason existed for the challenged action.  *Id.* at 1099.  The burden then shifts back to Larson to show that UAL's explanation is merely a pretext for discrimination.  *Id.*[1]

---

[1]  Title VII discrimination is only cognizable on the basis of sex, not sexual orientation.  42 U.S.C. § 2000e-2(a) (listing protected classifications); *Etsitty v.*
(continued...)

Larson's claim is one of reverse discrimination. For such a claim to advance, "It is not enough . . . for a plaintiff merely to allege that he was a qualified man who was treated differently than a similarly situated woman." *Adamson v. Multi Cmty. Diversified Servs., Inc.*, 514 F.3d 1136, 1150 (10th Cir. 2008). Instead, a plaintiff must present "evidence sufficient to support a reasonable inference that, *but for* his status as a man, the challenged decision would not have occurred." *Id.* (emphasis in original).

A review of the record evidence produced by Larson does not support a reverse discrimination claim, nor does it create an inference that UAL's decision to furlough Larson was a pretext for sex discrimination. First, and most tellingly, of the managers who were retained after the furlough, only one was female (Kelly Holder) and the other eleven were male. Larson's direct supervisor, Sprague, was male, and Larson admitted that none of the other managers who participated in the furlough decision ever made disparaging remarks based on gender. Larson also admits that he was replaced by a man. Taken in sum, these facts provide no basis that UAL discriminated against Larson on the basis of his sex.

---

[1](...continued)
*Utah Transit Auth.*, 502 F.3d 1215, 1222 (10th Cir. 2007) (finding that Title VII protections do not extend to harassment due to a person's sexuality). To the extent that Larson attempts to craft an argument that he was furloughed because of his status as a *gay* male, and not simply as a male, he does not present a cognizable claim under federal law. *See, e.g.*, Aplt. Br. at 30 (complaining about his *male* replacement who is "not gay").

In response, Larson points to the treatment of two women, a supervisor and

Kelly Holder, to support his claims. He claims the two women received

preferential treatment by being promoted and not being furloughed, respectively.

UAL responds that, even if these circumstances point to differential treatment,

such treatment is not sufficient to make out a case for reverse discrimination

based on sex. *See id*. at 1150 (finding that differential treatment is insufficient to

state a claim for reverse discrimination). We agree.

The supervisor Larson points to was Larson's supervisor prior to his

transfer. Larson argues that she was promoted to a higher position, while he was

instead transferred laterally. But Larson never applied for the position that his

former supervisor was promoted to. She, moreover, is not similarly situated to

Larson because she was at a different management level than Larson—and was

*his* supervisor at the time the promotion took place.[2]

Larson also claims that Holder was improperly retained in place of him.

Holder and Larson shared similar job duties and appear to have been friends.

Larson claims that he and Holder very candidly discussed the results of the

performance reviews. According to Larson, they each compiled their individual

---

[2] Additionally, Larson did not argue below that his transfer to a different management position qualifies as an adverse action, only the subsequent furlough decision. Even if he had, it was clearly a lateral transfer with no reduction in pay, benefits, or responsibilities. *See Sanchez v. Denver Pub. Schools*, 164 F.3d 527, 532 (10th Cir. 1998) (finding that a transfer was not an adverse action when salary remains the same and any differences are "a mere inconvenience or alteration of job responsibilities").

scores, as reported by Sprague, and determined that Larson's aggregate score was one point higher than Holder's. But Larson was furloughed after being told that his score was the lowest of the remaining managers.

The only evidence supporting this conversation is Larson's own assertions about the conversation—which, as mentioned above, are inadmissible hearsay. Larson has not provided any evidence to support this disputed point, other than his own testimony. Although Holder was deposed, the record is unclear what her versions of the events were. *See* App. at 509 (UAL counsel telling the district court "that is simply a statement that Ms. Holder doesn't back up").

In addition, the documentation produced by UAL undercuts Larson's version of events. *See id.* at 347–353. The record shows two evaluations for both Larson and Holder. Larson's aggregate scores are 13 and 13, while Holder's scores are 14 and 15. UAL explains that the two forms are the result of a switch in reporting methodology during the relevant time period. Instead of a system where certain factors were averaged and then summed, UAL moved to a system whereby all of the factors were merely summed, changing the scoring range from 4–20 to 2–22. The substance of both employee reviews remained the same—under either metric, Larson received a lower score than Holder. And as we pointed out above, Larson's unsupported allegation of his conversation with Holder is not admissible to rebut this evidence.

Next, Larson argues the reduction in force ranking process was so subjective that it allows an inference of pretext. He points to Sprague's testimony concerning how the actual ranking of the Larson-level managers was done prior to the furlough decision. According to Sprague's testimony, the ultimate decision to furlough Larson was a "collective decision," made after the conclusion of an all-day meeting ranking the Larson-level managers in Denver. *Id.* at 270–71. While the actual rankings from that session are not in the record, Sprague described this meeting as merely a "consistency session," where management met for the purpose of determining whether there were any mid-year review scores that were outliers—either too high or too low. *Id.* at 270. There is nothing in the record to indicate that the performance review scores of Larson or anyone else were changed as a result of this meeting.

Thus, we conclude that Larson has failed to meet his burden of making out a prima facie case of sex discrimination. Additionally, the record demonstrates that UAL had a legitimate, non-discriminatory reason for the adverse action—Larson's poor showing on the mid-year reviews.

And even if Larson had made out a prima facie case, he would then need to demonstrate that his furlough was merely a pretext for discrimination. In the context of a RIF, a plaintiff can demonstrate pretext by presenting evidence that (1) his own termination does not accord with the RIF criteria; (2) the RIF criteria were deliberately falsified or manipulated in order to terminate him; or (3) the

RIF was generally pretextual. *See Pippin v. Burlington Res. Oil & Gas Co.*, 440 F.3d 1186, 1193 (10th Cir. 2006). Larson does not argue that the RIF was generally pretextual, but instead urges that the criteria were applied in an uneven manner or with the predetermined goal of furloughing him. In essence, Larson believes that the RIF criteria that were *actually* used have never been disclosed to the court and the process was held in a secret and subjective manner.

But it is clear from the record that Larson had the lowest score of the managers in Denver and was furloughed on that basis. The rest of Larson's arguments are pure conjecture and cannot overcome the conclusion that UAL was exercising its proper business judgment. *See id.* at 1197 (finding that "an employer may cho[o]se to conduct its RIF according to its preferred criteria of performance, and we will not disturb that exercise of defendant's business judgment") (internal quotation omitted).

In sum, even if Larson did demonstrate a prime facie case of discrimination, UAL had a valid, non-pretextual reason for furloughing him. The district court properly granted summary judgment on the Title VII discrimination claim.

### B. *Title VII Retaliation*

Larson also claims he suffered Title VII retaliation because of his complaints to management about the disparaging letters.

To make a prima facie showing of retaliation, Larson must point to evidence that (1) he engaged in protected opposition to discrimination; (2) he suffered an adverse employment action; and (3) there was a causal nexus between his protected activity and the adverse action. *See Hennagir v. Utah Dep't of Corr.*, 587 F.3d 1255, 1265 (10th Cir. 2009). If this prima facie case is made, then UAL "has the burden of coming forth with a legitimate, nondiscriminatory reason for adverse action." *Id.* (citation omitted).

Since Title VII does not protect against sexual orientation discrimination, "[o]pposition to an employer's conduct is protected [by Title VII's retaliation provision] only if it is opposition to a practice made an unlawful employment practice by Title VII." *Petersen v. Utah Dep't of Corr.*, 301 F.3d 1182, 1188 (10th Cir. 2002) (internal quotations omitted). The two letters discussed above, and Larson's responses to both, form the only basis for Larson's suit. Both letters referred to discrimination on the basis of sexual orientation, not sex discrimination.

Neither letter supports a retaliation claim. The first is clearly derogatory, but UAL initiated an investigation into the letter and issued its own strongly worded response condemning it. Larson admitted that UAL's response was appropriate and that he did not think further communication was required. As to the second letter, it is not clear what aspect Larson contends is discriminatory. It

-13-

does not specifically reference Larson, nor does it make specific complaints about favoritism or hostility based on gender or sexual orientation.

Additionally, even broadly construed, nothing in the record demonstrates a causal link between Larson's complaints and the decision to furlough him. The two people who Larson claims to have complained to—an HR employee and Sprague—lack the requisite retaliatory link between Larson's protected conduct and the adverse action of his furlough. The HR employee was previously furloughed a few months prior to Larson, and Sprague had a non-retaliatory reason to furlough Larson as a result of the mid-year performance reviews. There is simply no link between Larson's protected activities and the decision to furlough him.[3]

Accordingly, the district court properly granted summary judgment on the retaliation claim.

### C. Colorado Anti-Discrimination Act

Larson's jurisdiction in this court was premised on his federal claims under Title VII, with his state-law claims allowed under the doctrine of pendant jurisdiction. Typically, a district court may not exercise pendant jurisdiction over a state law claim when the federal claim is insubstantial. *Carey v. Continental*

---

[3] After being notified of the furlough decision, Larson's counsel sent a letter to UAL complaining about discrimination. Larson points to this letter as evidence of retaliatory intent with respect to any future positions at UAL, but the only adverse action in this case is the furlough decision. Given the timing of the letter, there is clearly no nexus between it and the furlough decision.

*Airlines, Inc.*, 823 F.2d 1402, 1404 (10th Cir. 1987). But Larson's claims were not necessarily "insubstantial," so as the district court did, we will address the merits of Larson's state law claims. *See also Thatcher Enterprises v. Cache County Corp.*, 902 F.2d 1472, 1478 (10th Cir. 1990) (finding that even in the absence of any triable federal claims, a district court can exercise jurisdiction "in those cases in which, given the nature and extent of pretrial proceedings, judicial economy, convenience, and fairness would be served").

CADA discrimination and retaliation claims are subject to the same legal standards as Title VII claims. *See Johnson v. Weld County,* 594 F.3d 1202, 1219 n.11 (10th Cir. 2010); *Colorado Civil Rights Comm'n v. Big O Tires, Inc.*, 940 P.2d 397, 400 (Colo. 1997). But, importantly, Colorado *does* recognize sexual orientation as a protected status. *See* C.R.S. § 24-34-402(1)(a). For all of the reasons stated above, we deny Larson's challenge under state law with respect to discrimination and retaliation based on sex.

In support of his claim that he was furloughed because of his sexual orientation and in response to his protected activity of participating in gay events, Larson points to a handful of disparaging remarks made by Sprague over many months. Specifically, Larson refers to four instances of crude remarks: (1) Sprague's use of the term "Larson, the fag," in expressing "pride" about the diversity of his team; (2) jokes about a hole in the wall in Sprague's office that could be used for oral sex; (3) unspecified remarks about Larson's former partner

with whom Sprague was friends; and (4) comments from another UAL supervisor about Senator Larry Craig's arrest and "the things you do in airport bathrooms." *See* App. at 61, 66, 69–70, 83.

Larson did not complain about these remarks at the time they were made, and only brought them up once the prospect of litigation was on the horizon. He argues that he was made to simply "grin and bear it," during his employment, but that he was upset by these comments at the time they were made. Aplt. Br. at 14 n.3. Larson admitted that only once he lost his job did he "view[] things that had happened in a different light and . . . considered making . . . complaints." App. at 59.

But even if these comments were made, as distasteful as they are, there is no link between them and the decision to furlough Larson. *See Stone v. Autoliv ASP, Inc.*, 210 F.3d 1132, 1140 (10th Cir. 2000) (finding that "[a] plaintiff must demonstrate a nexus exists between the allegedly discriminatory statement and the company's . . . decision, and therefore that [the protected status] actually played a role in the defendant's decisionmaking process and had a determinative influence on the outcome") (internal quotation omitted). Nor does Larson pursue a hostile workplace claim based on the comments. As discussed above, UAL had a legitimate, non-pretextual RIF and applied performance evaluations to determine whether Larson would be furloughed. Larson even stated that he felt that Sprague was "joking" when making these comments and that Sprague was proud to have

Larson on his team. App. at 66. Larson also stated that at no time did he feel that Sprague did not want him on the team because he was a man or because of his sexual orientation. *Id.* And, finally, the record shows that at least one gay man was retained of the surviving Larson-level managers.

Accordingly, the district court properly granted summary judgment on these grounds.

### D. *Colorado Off-Duty Conduct*

Colorado law also prohibits employers from terminating an employee "due to that employee's engaging in any lawful activity off the premises of the employer during nonworking hours." C.R.S. § 24-34-402.5(1). But dismissal due to one's sexual orientation—even if Larson could prove that is what occurred—is not itself sufficient to state a claim under the statute. *See Robert C. Ozer, P.C. v. Borquez*, 940 P.2d 371, 375–76 (Colo. 1997) (finding that a claim must be based on specific conduct, not simply plaintiff's sexual orientation).

Like his CADA claims, Larson's off-duty conduct claims are supported solely by a variety of stray comments and are not causally linked to the decision to furlough him. Accordingly, the district court properly granted summary judgment on this claim.

# III.  Conclusion

For all of the foregoing reasons, we AFFIRM the district court's grant of summary judgment on all issues.

Entered for the Court,

Timothy M. Tymkovich
Circuit Judge